[No. 5875–II. Division Two. January 14, 1982.]

ALLEN R. SAYLER, ET AL, *Respondents,* v. ELBERFELD MANUFACTURING COMPANY, INC., *Appellant.*

*William R. Hickman,* for appellant.

*John L. Messina,* for respondents.

PETRIE, A.C.J.—On October 12, 1981, counsel for defendant Elberfeld Manufacturing Company, Inc., sought discretionary review in this court of a trial court's denial of their motions (1) for permission to withdraw as counsel for Elberfeld on the grounds of conflict of interest, and (2) for a continuance of trial to a date to be set upon the appearance of new counsel for defendant Elberfeld. Following an emergency hearing on October 15 (because jury selection had already commenced as scheduled on October 12) we granted review and a stay of trial after determining that probable error had been committed. Nevertheless, we recognized that plaintiff may be entitled to substantial terms arising from failure of defense counsel to discover the existence of the potential conflict at an earlier date. Accordingly, we ordered the matter of terms be addressed and

documented in the parties' briefs on the merits.

Subsequently, we accelerated review of plaintiff's amended motion for terms (together with several ancillary motions). At oral argument on those motions we were advised that plaintiff no longer resists Elberfeld's counsel's request to withdraw. Accordingly, the issue on the basic request for review has become moot, and the cause should be remanded for further proceedings after disposing the issue of terms.

Resolution of the matter of terms requires brief reflection on the nature of the underlying lawsuit. Plaintiff filed a complaint against Elberfeld on February 4, 1980 for injuries he allegedly sustained on April 26, 1977 when a heavy duty boom known as a Jiffy Lift Eagle which he was operating came in contact with high voltage electric lines. The boom and its accoutrements were allegedly designed and manufactured by defendant and initially sold to Lundberg Concrete Pipe Company. Defendant answered on April 2, admitting manufacture of a boom device as designated in the complaint and sale of such a device to Lundberg, but denying all other allegations. As one of four affirmative defenses, Elberfeld alleged that plaintiff's injuries were caused "by the alteration, misuse or failure to properly maintain the product by third persons not parties to this action."

On June 3, 1980, plaintiff revealed in answers to defendant's interrogatories that one of his theories of recovery was a design defect in the switches of the hand–held remote control cable–connected device which "allowed for errors in the operation of the boom" and that photographs taken at the scene of the incident and in his counsel's possession were available for inspection by the defendant. The actual device used has been lost and is no longer available, through no fault of either party. Nevertheless, on February 9, 1981, a photo of the actual hand–held device was sent to defendant. That same photo had been printed in a local newspaper shortly after plaintiff's injury. Subsequently, it became apparent that this device was not a hand–held con-

trol designed and manufactured by Elberfeld, but was, instead, manufactured by another, Dico Company, Inc. The record does not reveal exactly when Elberfeld or its attorneys became aware of the fact that a Dico control device was being used to operate the boom in April 1977, when plaintiff was injured. Elberfeld's counsel acknowledge, however, that such information was known to them at least by July 1981.

Plaintiff's deposition was taken on August 8, 1980. During that examination it became clear that plaintiff remembered nothing of the events which immediately preceded his injury. Nevertheless, he was questioned extensively by defense counsel concerning his recollection of the type of hand–held control and the nature of its prior malfunctioning. At one point during the examination defense counsel showed plaintiff a Polaroid photograph of a hand–controlled device. From the record it appears that this was not the photograph which had previously been published in the local newspaper. Plaintiff responded affirmatively to defense counsel's inquiry as to whether it was like the "handle" he would have had available at the time of his injury, but he also described it as a "plastic" handled device. Subsequently, it appeared that the newspaper photograph showed a hand–held control device encased in a metal shell, a device which was manufactured by Dico—not by Elberfeld.

Plaintiff also declared that sometimes the switches "would go out in a swinging or up and down position" and that the device had been repaired several times either by Lundberg's mechanics or by mechanics employed by Rucker Brothers, his employer. He acknowledged that sometimes the device would simply be replaced by another one. At one point defense counsel inquired

So it would be inoperative, it wouldn't go in the wrong direction, it just wouldn't work at all; is that what you are saying?

Plaintiff responded, "Yes."

At another point the following colloquy occurred between

defense counsel and plaintiff:

Q. Okay, now apart from those instances where you were operating the boom with the remote control panel and you would get no response from the boom, because the switch had failed, what other difficulties had you encountered in the use of this boom truck?

A. That is about the only difficulties, the switches would cause.

Q. Other than that the boom would not go in the direction that you intended it to go when you used the control panel, the remote control panel?

A. Right.

At another point, after being questioned as to the precise type of control device he had been using and the number of switches it had, plaintiff exclaimed, "Oh, God, I am so confused." In any event, it is clear from the record that plaintiff's counsel made all photographs in his possession available to defense counsel on June 3, 1980, prior to plaintiff's deposition of August 8. Indeed, on February 9, 1981, plaintiff's counsel did forward a copy of the newspaper photograph to defense counsel, together with interrogatories which were subsequently responded to by one of defendant Elberfeld's executive officers on March 30, 1981.

Subsequently, difficulties arose between counsel for both parties as to the precise operating manual applicable for use of the boom device plaintiff was using at the time of his injury. On September 28, 1981 plaintiff's counsel sent to defendant's counsel a copy of a manual which plaintiff's counsel considered to be descriptive of the particular equipment. Plaintiff had obtained this manual through another source, apparently after defense counsel had previously indicated to plaintiff's counsel that Elberfeld did not have a manual for use with this particular equipment. That manual included a "trouble shooting guide," including an item number six describing procedures to follow on those occasions when the switches failed to respond to the operator's command to halt the movement of the boom. In the letter of transmittal, plaintiff's counsel also advised that plaintiff would testify that "he had previously encountered

difficulties with the equipment as specified in the trouble shooting guide, item number six."

This letter prompted a second deposition of plaintiff, taken on October 7, 1981. At that deposition, plaintiff declared that in the past, when he experienced difficulties with the hand–controlled device he would turn the device over to the mechanics and tell them what the problem was. He identified some of those problems as "a lot of times it wouldn't shut off and it was supposed to" and "[w]hen you pushed the button on and let go of the switch it [the boom] would just keep on going," and this happened with "all buttons at one time or another." When the boom failed to stop on command he would "hit the stop button, emergency stop button."

On October 12, the date trial commenced, defense counsel moved for permission to withdraw and for continuance of the trial. Defense counsel revealed in argument to the court that the hand–held control device was manufactured by Dico, another client of his firm, and that his firm was "aware of what problems they [Dico] have had in the past relating to control boxes and crane controls." Further, defense counsel advised the court that Elberfeld was now insisting that Dico be brought into the action as a third party defendant for the purpose of seeking contribution pursuant to authority recently provided by the products liability–tort reform act of 1981, Laws of 1981, ch. 27, effective July 26, 1981. Defense counsel's position is amply described in oral argument before the trial court as follows:

> When we took the deposition of the plaintiff a little over a year ago, in other words, the first deposition, he had indicated that other than an occasion when one of the toggle switches in this box would just quit, it would burn out—the result of that being that then the crane simply would not move at all—there had been no malfunction, no control malfunctions with respect to the crane. There was no evidence indicating a malfunction in that control box, so there was never any problem. Now, in response to some interrogatories, a second set of interrogatories I submitted to the plaintiff, I received a letter

from one of plaintiff's counsel on September 30 of this year, a little more than a week and a half ago, approximately, indicating that Mr. Sayler intended to testify that he had experienced control malfunctions of this device prior to the accident. Mr. Sayler does not recall the accident itself, but he was going to testify that he had experienced control problems. So I redeposed Mr. Sayler five days ago, on October 7, and he testified at that time that in addition to the situation where switches would burn out and the crane would not work, there were occasions when an operator would flip a switch and the crane would start to move, then the operator would let go of the switch, which should cause the crane to stop, but it wouldn't stop; it would keep going. It is my understanding and assumption that as a result of that testimony, plaintiff intends to use that as a basis for making claim that there was in fact a malfunction of the crane control involved in this case which contributed to or caused the accident and caused Mr. Sayler's injury.

Now, the result of that testimony is that my client, Elberfeld, under the new Tort Reform Act, has to commence a third–party action for contribution against Dico, the manufacturer of the control box in this case. Of course, that would necessarily involve a continuance of the trial date.

The difficulty that poses for me is that my office is also involved in representing the Dico Company in another lawsuit involving an electrical injury to a person who was operating a crane manufactured by Dico. In other words, the facts are very similar to the facts in this case. *My office is representing Dico in that case, has represented them for some time, and of course has had access and has obtained a considerable amount of material from Dico relating to their manufacturing of Dico cranes and Dico boxes, and has consulted with Dico regarding potential electrical problems with their hand–control boxes.* Under those circumstances, I cannot, ethically, as I understand the Code of Professional Responsibility, continue to represent Elberfeld in a situation where they have to sue Dico and/or in a situation where they have to point at Dico as the party responsible for this accident, at least in a situation where they have a legal ability to bring an action against Dico, which they do, again, under the new contribution statute.

(Italics ours.)

Plaintiff's counsel asserted, on the other hand, that plaintiff's theory was not that the hand–held control device malfunctioned; rather, plaintiff claims the malfunction was in electrical relays and the hydraulic valves which are supposed to respond to the control box commands—and that when the boom did not so respond, plaintiff would have to hit the emergency button on the hand–held control. Plaintiff contends, and defense counsel does not deny, that Elberfeld was fully aware of this theory at least by July 1981, and probably before that date.

Following argument on defense counsel's motion to withdraw, the trial court suggested, as an alternative to a continuance,

> to exclude any evidence, speculative or otherwise, about any defect or malfunction related to this control box, whether it's an Elberfeld or Dico control box or whatever.

The colloquy which followed the trial court's suggested alternative follows:

> MR. RANKIN: Your Honor, might I speak to that just for a moment? While the plaintiffs claim they are not going to introduce any evidence against the box, and while you have stated that you would rule on the motion in limine and exclude any such evidence, the plaintiffs intend to advance a control malfunction theory on the part of the crane. And in defending against that malfunction theory, I have to alternatively say that there was no malfunction. That would be the first alternate. The second is that I have to say that if there was, it was in the control box. I have to defend the case on that basis.
>
> MR. MESSINA: He has no evidence of that, Your Honor. He's not going to have any at this trial.
>
> MR. RANKIN: You don't know that.
>
> MR. MESSINA: Well, do you?
>
> MR. RANKIN: It is my position that that will not solve my problem, will not prevent me from being in conflict with my other client, Dico. In other words, excluding the plaintiff's evidence or excluding any evidence of malfunction of the box simply ties my hands.

Regardless of the respective theories as to the cause of

plaintiff's injuries, we held that circumstances as they existed on October 12 demanded that a continuance be granted. To have ordered otherwise would have forced defense counsel into an intolerable position of choosing between their two clients. Mandatory withdrawal was in order. (CPR) DR 2-110(B)(2). Without doubt, good cause for a continuance was shown. For that reason, we unhesitatingly ordered the stay. The only real question is whether terms should have been imposed pursuant to CR 40(d), which provides in part that in a proper case, the court may reset the case for trial and impose terms. Had the trial court granted the continuance, it would have been the appropriate jurisdiction to resolve the issue of terms. Under the posture of the appeal, however, we deem it appropriate for us to resolve the dual issues of whether terms should be imposed and, if so, the amount thereof.

The first part of the issue requires an answer to the question of who was responsible for the postponement. *State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.,* 87 Wn.2d 298, 553 P.2d 423 (1976). Defense counsel contend they were not forced into an ethical difficulty until plaintiff's second deposition (taken 5 days before trial) revealed a change or—as indicated at oral argument—an elaboration of his prior testimony and presented evidence, arguably at least, to make a jury issue out of a malfunction of the hand–held control device manufactured by Dico. Plaintiff contends that defense counsel should have reasonably anticipated the ethical difficulty.

■ In order to resolve the real issue, we focus on (CPR) DR 5-105(B) and (C), together with (CPR) EC 5-14 and 5-15.[1] Defense counsel maintain, and we accept as a fact,

---

[1](CPR) DR 5-105(B) and (C) provide:

"(B) A lawyer *shall not continue* multiple employment *if the exercise of his independent professional judgment* in behalf of a client will be or *is likely to be adversely affected* by his representation of another client, *except* to the extent permitted under DR 5-105(C).

"(C) In the situations covered by DR 5-105(A) and (B), a lawyer *may represent multiple clients if it is obvious* that he can adequately represent the interest of

that, until plaintiff elaborated on his testimony a few days before trial, they had Elberfeld's and Dico's consent to continue representation even after full disclosure to both of the possible effect of such representation on the exercise of their independent professional judgment on behalf of both. As a predicate to such consent, however, it must be *obvious* that counsel can continue to adequately represent the interest of each client. There can be no doubt that the potential conflict was apparent at least by July 1981—and arguably should have been known long before then. Because of the knowledge of those "potentially differing interests," counsel must resolve all doubts against the propriety of continuing the representation. The reason, as set forth in (CPR) EC 5–15, is that if the potential conflict should "become actually differing, he would have to withdraw" with the "likelihood of resulting hardship on the cli-

---

each *and* if *each consents* to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." (Italics ours.)

(CPR) EC 5–14 and 5–15 provide:

"**EC 5–14** Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. This problem arises whenever a lawyer is asked to represent two or more clients who may have differing interests, whether such interests be conflicting, inconsistent, diverse, or otherwise discordant."

"**EC 5–15** *If a lawyer is requested* to undertake or *to continue representation of multiple clients having potentially differing interests,* he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. *He should resolve all doubts against the propriety of the representation.* A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. *If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially.* On the other hand, there are many instances in which a lawyer may properly serve multiple clients having potentially differing interests in matters not involving litigation. If the interests vary only slightly, it is generally likely that the lawyer will not be subjected to an adverse influence and that he can retain his independent judgment on behalf of each client; and if the interests become differing, withdrawal is less likely to have a disruptive effect upon the causes of his clients." (Italics ours.)

ents".

Analyzing the facts of the case at bench against that standard, it seems apparent that plaintiff's elaboration on October 7 may have been the event which precipitated *mandatory* withdrawal—but it was not the event which caused the continuance of trial. Defense counsel continued representation of both Elberfeld and Dico in the hope and expectation that they would never be called upon to divulge confidential information they had as to Dico's control device. That judgment ultimately proved unjustifiable. Counsel chose to accept a risk that they would never have to seek permission to withdraw. Not only did that risk fail but, additionally, it failed at a most inopportune time. The real cause of the continuance was defense counsel's failure to accurately assess the risk they assumed as early as July 1981. There can be only one price to pay for that failure— imposition of reasonable terms measured by the reasonable cost to plaintiff of the continuance.

Plaintiff has set forth nonrecoverable costs in the amount of $6,333.71 and has indicated that time spent on pretrial attorney and office preparation for trial exceeded $45,000. Not all the preparation time will prove to be unnecessary in a rescheduled trial. We estimate the unnecessary attorney time caused by the continuance amounted to the sum of $20,000 in fees.

The cause is remanded to the trial court with direction to permit present defense counsel to withdraw from representation of defendant Elberfeld. We deem it unnecessary to impose a condition upon our order of terms, but we do impose terms upon defendant Elberfeld in the total amount of $26,333.71, which we direct be paid within 30 days from the issuance of the mandate herein.

PETRICH, J., concurs.

PEARSON, J. (dissenting)—I respectfully dissent from the above opinion for the following reasons. It is not at all clear to me that defense counsel's lack of diligence was totally

responsible for the failure to discover the conflict of interest substantially earlier than he did. At least that question is somewhat debatable. The record indicates that plaintiff may have contributed to the delay in discovery of the conflict by testifying differently in two depositions. The ultimate result was that a change in plaintiff's testimony in a deposition made some 5 days before trial interjected a new theory of defense into the case. As a result, zealous advocacy for defendant Elberfeld Manufacturing Company would have required defense counsel to take a position contrary to the interests of another client of his office.

There is no question in my mind that the conflict of interest was real and that the trial court should have granted defense counsel's motion to withdraw. (CPR) DR 5–105(B), DR 2–110(B)(2). What is less clear to me is who should bear the extensive costs occasioned when the trial was aborted by this court after jury selection was under way. Both clients are equally disadvantaged by the delay, and both will have to pay for duplicating many of the costs and counsel fees. Were the fault for this unfortunate occurrence clear, I would not hesitate to impose the terms ordered by the majority. However, since I am not convinced that total fault can be attributed to defense counsel's omissions, and since there has been no showing of bad faith, it would be unfair to burden defense counsel or his client with the entire costs and expenses. At the very least, such costs and counsel fees should abide a trial on the merits.

Accordingly, I respectfully dissent.

Reconsideration denied February 10, 1982.

Review granted by Supreme Court June 11, 1982.