[Nos. 20050-3-II; 20837-7-II. Division Two. November 19, 1999.]

HOWARD I. MOE, ET AL., *Appellants*, v. JOSEPH E. WISE, ET AL., *Defendants*, ARNOLD B. ROBBINS, ET AL., *Respondents*.

*Susan Lynn Solan*; *Timothy James Parker* and *James Elliot Lobsenz* of *Carney, Badley, Smith & Spellman*; and

*Thomas Avery Brown* of *Brown, Lewis, Janhunen & Spencer,* for appellants.

*Thomas Joseph West* and *Heidi Nuss Imhof* of *Thompson, Krilich, LaPorte, West, & Lockner,* for respondents.

SEINFELD, J. — Howard Moe appeals the trial court's dismissal of his defamation action against defendant Arnold Robbins, the attorney for a business in Chapter 11. The trial court held that the "common interest" qualified privilege protected Robbins's allegedly defamatory communication about Moe's role in the business's financial losses. The trial court further found no abuse of that privilege. Holding that a Chapter 11 bankruptcy debtor and its creditors share a common interest in determining the cause of the subject business's financial failure, we uphold the ruling regarding privilege and affirm the dismissal. But we remand for recalculation of terms imposed because of Robbins's request for a continuance.

### FACTS

Moe sold his long-time business, Little Hoquiam Boat Shop, to R.O.I., Inc. (ROI), in 1988. ROI renamed the company Hoquiam Boat Shop, Inc., but retained Moe, pursuant to the sale agreement, as an employee/consultant.

Joseph Wise became the chief executive officer of Hoquiam Boat in September 1990. Because of Hoquiam Boat's poor financial health, in late 1990 Michael Daspin, the head of ROI, hired attorney Robbins to prepare and file a Chapter 11 petition. Robbins filed that action in December 1990.

According to Robbins, Daspin also asked him to sue Moe for allegedly misrepresenting the business's profit margin at the time the parties were negotiating the sale. After Robbins spoke to ROI's accountant and reviewed his files, he believed the allegation of misrepresentation was true.

Shortly after filing bankruptcy, Wise sent a letter to trade creditors, hull owners (owners of boats under construction), and a newspaper reporter. The letter, which sought support in federal court for cancellation of the company's boat contracts, blamed Moe for Hoquiam Boat's bankruptcy. Specifically, the letter alleged that Moe had misrepresented Hoquiam Boat's projected profit margin as 30 percent and had permitted the company to enter into new boat manufacturing contracts at below cost prices. The letter also stated:

> The beneficiaries of Hoquiam Boat Shop's activities over the past two years are Moe and those that have taken delivery of completed boats at below cost prices without the owner's awareness, and those with boats in varying degrees of completion who would have us continue performing on sub-standard contracts. Those that are hurt are the skilled men and women of Hoquiam Boat Shop, and their families, whose reward for producing the best quality fishing boat available is lay-off and the unemployment line. Additionally, the trade creditors of Hoquiam Boat Shop have also sufferred [sic]. Their reward for being a loyal supplier of equipment and components, under unsecured conditions, has been late payments and broken promises.
>
> . . . .
>
> I regret that the past effects of what the stockholders have advised me to be a failure on the part of the former owner to advise the purchasers of contracts taken at sub-standard margins, caused these steps to be taken.

Wise claimed that he and Daspin coauthored the letter with Robbins and that he had asked Robbins to investigate the allegations about Moe. But Robbins claimed that he had never talked to Daspin and that when he saw the letter, he advised Wise not to send it. However, when Wise ad-

vised Robbins that Daspin had ordered the letter sent, Robbins agreed to edit it, and he subsequently made a number of deletions and changes. Robbins testified that he had tried to "tone down" the letter because he thought the allegations against Moe would fail to accomplish the "underlying objective," which was to enlist the trade creditors' support for the reorganization plan. Robbins did not insist that Wise remove the allegations against Moe because he did not think such revisions were within the ambit of his authority.

Moe responded to the letter by filing a defamation suit against Wise in January 1991 and by filing an amended complaint in October 1992 that included Robbins as a co-defendant. In June 1994, the court assigned an October 10, 1995, trial date. Robbins filed his answer in April 1995. In August, Wise answered the amended complaint and filed a cross-claim against Robbins for attorney malpractice. At about the same time, Moe disclosed over 100 new witnesses for trial.

The next month, Wise and Robbins both moved for a continuance. The trial court granted the continuance, but assessed $5,000 in terms against Wise and against Robbins, telling counsel: "You can make your checks out to the Grays Harbor County Food Bank. We're going to pay the poor." But the trial court's written order does not reference the food bank; the order merely directs counsel to make payment to the registry of the court.

At trial, Moe testified that the allegations in the letter were untrue and hurtful. He said that hull owners had contacted him after receiving the letter to express their disgust and unhappiness with him. And hull owners and trade creditors testified that the letter caused them to wonder whether Moe was responsible for the bankruptcy; they said it was a factor in not asking Moe to do future work.

When Moe reacquired Hoquiam Boat in 1991, he had difficulty reestablishing the business. He asserted that the defamation made it difficult for him to retain existing

contracts, obtain financing, and win new customers. But he also acknowledged that other factors, such as restarting the company from bankruptcy, the general downward trend in the fishing industry, and changing government regulations, affected profits. Relying upon past experience, Moe attributed at least 25 percent of his lost profits, which his accountant estimated to be $3,985,754, to the defamation.

At the close of the plaintiff's case, Robbins moved for dismissal. He argued that (1) he was protected by a common interest qualified privilege, and (2) he could not be liable because he did not provide the defamatory material contained in the letter. The trial court granted Robbins's motion, reasoning that (1) Robbins had acted under a qualified privilege, and (2) there was no showing that Robbins had abused the privilege.

The trial proceeded without Robbins. The jury found Wise liable and awarded Moe damages of $1,333,000.[1]

Moe appeals Robbins's dismissal. He argues that (1) the trial court erred in finding Robbins protected by a qualified privilege; and (2) if we remand the case, the doctrine of estoppel should prevent Robbins from contesting the amount of damages. Robbins cross-appeals, arguing that: (1) he did not utter a defamatory statement and, if he did, it caused Moe no harm; (2) there was insufficient evidence to place the issue of lost profits before the jury when the trial proceeded against Wise; and (3) the trial court erred in assessing $5,000 in terms against him.[2]

## DISCUSSION
### I. Qualified Privilege

██ A trial court should grant a motion for a directed verdict if, as a matter of law, no evidence or reasonable inferences exist to sustain a verdict for the nonmoving

---

[1]Wise later settled with Moe and is not a party to this appeal.

[2]Robbins does not raise the issue of whether and under what circumstances an attorney may be liable for editing a letter written by his client that allegedly is defamatory. Thus, we limit our discussion to the issue of privilege.

party. *Bender v. City of Seattle*, 99 Wn.2d 582, 587, 664 P.2d 492 (1983). We review the evidence in the light most favorable to the nonmoving party. *Id.* at 587.

■■ A defamation plaintiff must prove (1) falsity, (2) an unprivileged communication, (3) fault, and (4) damages. *Caruso v. Local Union No. 690*, 107 Wn.2d 524, 529, 730 P.2d 1299 (1987); *Bender*, 99 Wn.2d at 599. The type of fault and the quantum of evidence that the plaintiff must prove turns on whether plaintiff is a public official or a private individual. *Id.* A public figure plaintiff must show by clear and convincing evidence that the defendant published the defamatory matter with actual malice: with knowledge of the matter's falsity or made with reckless disregard of its falsity. *New York Times Co. v. Sullivan*, 376 U.S. 254, 285-86, 84 S. Ct. 710, 11 L. Ed. 2d 686, 95 A.L.R.2D 1412 (1964); *Margoles v. Hubbart*, 111 Wn.2d 195, 199-200, 760 P.2d 324 (1988). By contrast, a private defamation plaintiff such as Moe need establish only negligence by a preponderance of the evidence. *See Bender*, 99 Wn.2d at 599; *Haueter v. Cowles Publ'g Co.*, 61 Wn. App. 572, 580-81, 811 P.2d 231 (1991).

Here, the evidence was sufficient to establish elements one, falsity, and four, damages. At issue is whether the communication was privileged, and if so, whether Robbins lost the privilege through abuse.

1. The Applicability of a Qualified Privilege

■ There is a qualified privilege to make an otherwise defamatory statement under numerous circumstances. *See generally* RESTATEMENT (SECOND) OF TORTS §§ 593-597 (1977). The existence of the privilege is a matter of law for the court to decide. RESTATEMENT, *supra*, § 619(1); *Liberty Bank of Seattle, Inc. v. Henderson*, 75 Wn. App. 546, 563, 878 P.2d 1259 (1994); *Demopolis v. Peoples Nat'l Bank*, 59 Wn. App. 105, 110, 796 P.2d 426 (1990).

■ Here, the trial court applied the "common interest" qualified privilege. The common interest privilege applies when the declarant and the recipient have a common inter-

est in the subject matter of the communication. *See Ward v. Painters' Local Union No. 300*, 41 Wn.2d 859, 865-66, 252 P.2d 253 (1953) (members of union discussing officers and members).

> The rule is based on the fact that one is entitled to learn from his associates what is being done in a matter in which he has an interest in common with them. This interest in their common affairs entitles him to information as to how they are conducted, or to information that affects the common interest, even though he is not personally concerned with the information.

RESTATEMENT, *supra*, § 596 cmt. c. Thus, the privilege applies even if the communication's purpose is not to protect a commonly held interest. *Id.*

> An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter to correctly or reasonably believe that there is information that another sharing the common interest is entitled to know.

RESTATEMENT, *supra*, § 596; *Ward*, 41 Wn.2d at 865.

Washington courts have applied the common interest privilege to communications among officers of an unincorporated, nonprofit association about their members and officers' qualifications and their participation in association activities. *Ward*, 41 Wn.2d at 865-66. Washington law also gives protection to communications among partners about partnership litigation to recover money owed to the partnership. *Parry v. George H. Brown & Assocs., Inc.*, 46 Wn. App. 193, 197, 730 P.2d 95 (1986).

The comments to the RESTATEMENT suggest that the privilege is available generally for persons involved in the same organizations, partnerships, associations, or enterprises who are communicating on matters of common interest. RESTATEMENT, *supra*, § 596 cmts. d, e; *see, e.g., Guinn v. Church of Christ*, 775 P.2d 766, 784-85 (Okla. 1989) (present or prospective church members); *Daywalt v. Montgom-*

*ery,* 393 Pa. Super. 118, 573 A.2d 1116, 1118-19 (1990) (intradepartmental communications); *Tibke v. McDougall,* 479 N.W.2d 898, 905 (S.D. 1992) (members of a horse club); *Zinda v. Louisiana Pac. Corp.,* 149 Wis. 2d 913, 440 N.W.2d 548, 552-53 (1989) (employer-employee); *Williams v. Blount,* 741 P.2d 595, 596 (Wyo. 1987) (routine business transaction in which both parties have a pecuniary interest). These authorities suggest that the privilege arises when parties need to speak freely and openly about subjects of common organizational or pecuniary interest.

The dissent, citing *Demopolis,* 59 Wn. App. at 115 n.10, contends that the qualified privilege is available only where the declarant and recipient are allied. *Parry,* 46 Wn. App. at 197. But a close scrutiny of the case law shows that the focus belongs on the declarant's and recipient's relationship to the subject matter, not to each other.

First, we note that the cited portion of *Demopolis* is dicta wherein Division One of this court "questioned" whether there was a qualified privilege because the parties were not "allied." 59 Wn. App. at 114-15 (communicant and recipient were opponents in litigation communicating outside courtroom). Further, *Demopolis* cited *Parry* where, although the declarant and recipient happened to be allied, this fact was not the basis for the court's holding. *Parry,* 46 Wn. App. at 196-97. In addition, *Demopolis's* cite to *Ward,* 41 Wn.2d at 865, is misleading. 59 Wn. App. at 115 n.10. In *Ward,* the declarant and recipient did belong to the same organization but, again, the focus was on the fact that they were communicating on subject matters of common interest. 41 Wn.2d at 865-66.

Authority from other jurisdictions supports this focus on a shared interest in the subject matter rather than on allied interests. For example, in *Williams,* the determinative factor was that the declarant (title insurance company officer) and recipient (bank officer) shared a pecuniary interest in a routine business transaction that was the subject of the communication (title insurance application). 741 P.2d at 596. The parties in *Williams* were not allied; the title in-

surance company wanted the bank to guarantee the applicant's loan because of the applicant's alleged financial difficulties. *Williams*, 741 P.2d at 596. In *Petrus v. Smith*, 91 A.D.2d 1190, 459 N.Y.S.2d 173, 174 (1983), rejected by *Demopolis*, an out-of-court statement to an opposing litigant enjoyed a qualified privilege because it related to the litigation that was of interest to both parties. And in *Rosen v. Brandes*, 105 Misc. 2d 506, 432 N.Y.S.2d 597, 601 (1980), the parties were adversaries but the privilege applied because "the recipient of the letter had a mutuality of interest in the subject matter of the letter."

■ This need for open and free communications is present in the bankruptcy context. The ultimate goal of Chapter 11 is "a reorganization plan that enables the debtor to restructure its pre-bankruptcy debts, pay its creditors, and return to active operation as a viable enterprise, free from judicial control and creditor scrutiny." *In re Great Am. Pyramid Joint Venture*, 144 B.R. 780, 788 (Bankr. W.D. Tenn. 1992). The financial restructuring scheme is also designed to preserve jobs, *In re Gonic Realty Trust*, 909 F.2d 624, 627 (1st Cir. 1990), and to pay creditors "equitably" from available funds, *In re De Laurentiis Entertainment Group Inc.*, 963 F.2d 1269, 1274 (9th Cir. 1992). To accomplish these goals, the code contains provisions that preserve the *status quo* between debtor and creditor while they reach an "amicable adjustment" under the supervision of the bankruptcy court, "thus affording an opportunity to plan reorganization without a race between creditors and maintaining at the same time a going concern value for all parties in interest." *Senfour Inv. Co. v. King County*, 66 Wn.2d 644, 646, 404 P.2d 760 (1965).

Essentially, a Chapter 11 debtor and its creditors are engaged in a cooperative effort and share a common broad goal, the protection or creation of sufficient assets or profits to maintain the business and pay its debts. To this end, the bankruptcy code mandates creation of one or more creditors' committees, 11 U.S.C. § 1102, and further empowers such committees to "investigate the acts, conduct, assets,

liabilities, and financial condition of the debtor, the operation of the debtor's business and the desirability of the continuance of such business, and any other matter relevant to the case or to the formulation of a plan." 11 U.S.C. § 1103(c)(2).

The dissent points out that some creditors may have different interests than others. Clearly, there may be tactical reasons for a Chapter 11 debtor to emphasize different points in communicating with different creditors in different circumstances. Nonetheless, the Chapter 11 debtor and its creditors share one overriding interest—keeping the boat afloat. Should the debtor go under, there is a high likelihood that everyone associated with the enterprise will sustain adverse consequences. Thus, despite individual differences, a Chapter 11 debtor and its creditors share an overarching common interest in returning the business "to active operation as a viable enterprise" that will have value for all parties in interest. *Great Am. Pyramid*, 144 B.R. 780; *see also* 11 U.S.C. §§ 1102, 1103; *In re Deer Park, Inc.*, 10 F.3d 1478, 1485 (9th Cir. 1993); *De Laurentiis*, 963 F.2d at 1274; *Gonic Realty*, 909 F.2d 624.

Consequently, to be successful under Chapter 11, both debtor and creditor must be able to communicate freely and openly on subjects pertinent to the financial health of the debtor. *See Citicorp Venture Capital, Ltd. v. Committee of Creditors*, 160 F.3d 982, 987-88 (3d Cir. 1998) (holding that debtor's fiduciary breached its duty by failing to disclose transaction to debtor's board and committee of creditors). To enlist creditor support for a Chapter 11 reorganization plan, a bankrupt debtor might reasonably provide creditors with background information on the reasons for the business's financial difficulties. Likewise, it would be reasonable for a creditor to seek an explanation as to why the debtor needed to file for reorganization and what steps the debtor is taking to protect the creditor's interests.

Based on the foregoing, we conclude that Chapter 11 debtor-creditors communications about the potential causes of the business's failure satisfy the Restatement § 596

criteria; each party has a common interest in the subject matter and is entitled to know about the information. *Ward*, 41 Wn.2d at 865. Without this privilege, the potential of liability for defamation could interfere with the need for open and frank debtor-creditor communications.

Here, the success of Hoquiam Boat's Chapter 11 plan depended upon the cooperation of trade creditors and hull owners. Under these circumstances, it was reasonable for Hoquiam Boat to explain the reasons for its financial failure to both classes of creditors. Hoquiam Boat and its creditors "had a mutuality of interest in the subject matter of the letter." *Rosen*, 432 N.Y.S.2d at 601.

The challenged letter suggests that Moe's conduct led to worker layoffs. But employee welfare is sufficiently pertinent to the bankruptcy issues to be encompassed by the privilege. *Gonic Realty*, 909 F.2d at 627. Further, any closer scrutiny and dissection of the letter's language would undermine the policy supporting the privilege—the need for free and open communications. The alleged misstatements in Wise's letter, although hurtful to Moe, do not defeat the purpose of the privilege—to facilitate free and open communication between the Chapter 11 debtor and its creditors. Thus, we find the trial court did not err in applying the "common interest" qualified privilege to Robbins's communication.

2. The Abuse of Qualified Privilege

We next must determine whether Robbins abused the qualified privilege. Whether a speaker abused a privilege is a question of fact for the jury to decide "unless the facts are such that only one conclusion can reasonably be drawn." RESTATEMENT, *supra*, § 619(2) cmt. b. Whether a party has established a prima facie case of abuse is a question of law. *Wildes v. Prime Mfg. Corp.*, 160 Wis. 2d 443, 465 N.W.2d 835, 839 (1991). We conclude that Moe failed to establish a prima facie case of abuse.

An absolute privilege absolves the defendant of all liability for the defamatory statement. *Bender*, 99 Wn.2d at

600. "A qualified privilege, on the other hand, may be lost if it can be shown that the privilege has been abused." *Bender*, 99 Wn.2d at 600 (citing *Gem Trading Co. v. Cudahy Corp.*, 92 Wn.2d 956, 960, 603 P.2d 828 (1979)). The defendant abuses the qualified privilege if he or she (1) knows the matter to be false or acts in reckless disregard as to its truth or falsity of the statement, *Bender*, 99 Wn.2d at 601, RESTATEMENT, *supra*, § 600; (2) does not act for the purpose of protecting the interest that is the reason for the existence of the privilege, *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1559 (4th Cir. 1994), RESTATEMENT, *supra*, § 603; (3) knowingly publishes the matter to a person to whom its publication is not otherwise privileged, *Foretich*, 37 F.3d at 1559, RESTATEMENT, *supra*, § 604; (4) does not reasonably believe the matter to be necessary to accomplish the purpose for which the privilege is given, *Wildes*, 465 N.W.2d at 839, RESTATEMENT, *supra*, § 605; or (5) publishes unprivileged as well as privileged matter, *Furgason v. Clausen*, 109 N.M. 331, 785 P.2d 242, 254 (1989), RESTATEMENT, *supra*, § 605A.

■ As noted earlier, a private figure defamation plaintiff need prove only the defendant's negligence by a preponderance of the evidence to establish a prima facie case of defamation. *Bender*, 99 Wn.2d at 600. But once the defendant establishes a qualified privilege, to prove the abuse of that privilege even a private figure plaintiff must satisfy the higher clear and convincing standard otherwise applied only to public figure plaintiffs. *Lillig v. Becton-Dickinson*, 105 Wn.2d 653, 658, 717 P.2d 1371 (1986); *Bender*, 99 Wn.2d at 601; *see also Kass v. Great Coastal Express, Inc.*, 152 N.J. 353, 704 A.2d 1293, 1294 (1998) (clear and convincing standard applies to all recognized forms of abuse).

The higher quantum of proof necessary to overcome a qualified privilege stems from the public policy bases supporting privileges. Here, because there is a need for the free and open exchange of information between the Chapter 11 debtor and its creditors, "the standard of proving abuse

of the privilege must necessarily be high." *Bender,* 99 Wn.2d at 601; *see also Sedore v. Recorder Publ'g Co.,* 315 N.J. Super. 137, 716 A.2d 1196, 1210 (1998) (lesser burden of proof will not protect interests underlying privilege).

When deciding a directed verdict, "the judge must view the evidence presented through the prism of the substantive evidentiary burden." *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).[3] Consequently, we must determine whether a trial court could conclude, viewing the evidence favorably toward Moe, that a reasonable jury could find abuse of the qualified privilege by clear and convincing evidence. *See id.* at 255-56.[4]

a. Reckless Disregard

 Here, Moe has failed to provide sufficient evidence that Robbins had knowledge of the falsity or acted in reckless disregard as to the falsity of the statement. *Lillig,* 105 Wn.2d at 658; *Bender,* 99 Wn.2d at 601; *Gilman v. Mac-Donald,* 74 Wn. App. 733, 738, 875 P.2d 697 (1994); *Story v. Shelter Bay Co.,* 52 Wn. App. 334, 341-42, 760 P.2d 368 (1988); *Hardy v. Saliva Diagnostic Sys., Inc.,* 995 F. Supp. 258, 267 (D. Conn. 1997) (applying Washington defamation law); RESTATEMENT § 600. This description of reckless disregard is the same as the *New York Times* definition of "actual malice." *Haueter,* 61 Wn. App. at 588 n.5. Thus, to show abuse, Moe must overcome the same burden facing a public official plaintiff: he must prove that Robbins acted

---

[3]We note that the *Haueter* court, citing *Anderson,* properly applied the preponderance standard for a private plaintiff's prima facie defamation claim. 61 Wn. App. at 581-82. But the *Haueter* court apparently overlooked *Bender*'s clear and convincing requirement and, thus, incorrectly applied the preponderance standard when reviewing the plaintiff's claim of abuse of qualified privilege. 61 Wn. App. at 587-88, 590. But because the plaintiff in *Haueter* failed to even satisfy the preponderance standard, application of the incorrect standard did not affect the result. *Compare Haueter with Story v. Shelter Bay Co.,* 52 Wn. App. 334, 343, 760 P.2d 368 (1988) (reversible error for trial court to apply negligence standard to abuse of qualified privilege).

[4]*But see Turngren v. King County,* 104 Wn.2d 293, 310, 705 P.2d 258 (1985) (Supreme Court applied pre-*Bender* negligence standard to find abuse of a qualified privilege in the summary judgment context.).

with actual malice. *See generally Story*, 52 Wn. App. 342-43 (public official fault standard applied against private plaintiff in abuse of privilege analysis).[5]

■■■ "The standard for finding actual malice is subjective and focuses on the declarant's belief in or attitude toward the truth of the statement at issue." *Id.* at 343 (citing *Herron v. KING Broad. Co.*, 109 Wn.2d 514, 523, 746 P.2d 295 (1987) (*Herron* I); *Tilton v. Cowles Publ'g Co.*, 76 Wn.2d 707, 722, 459 P.2d 8 (1969)). "To prove actual malice a party must establish that the speaker knew the statement was false, or acted with a high degree of awareness of its probable falsity, or in fact entertained serious doubts as to the statement's truth." *Story*, 52 Wn. App. at 343 (citing *Herron* I, 109 Wn.2d at 523; *Tilton*, 76 Wn.2d at 722).

There is no evidence that Robbins had actual, subjective knowledge that the allegations were false. *Herron v. KING Broad. Co.*, 112 Wn.2d 762, 775, 776 P.2d 98 (1989) (*Herron* II). Thus the question is whether there was evidence from which a jury could conclude that Robbins acted with reckless disregard. *Id.* at 775.

■■■ To prove reckless disregard, the plaintiff must show with clear and convincing evidence that the defendant in fact entertained serious doubts as to the truth of the publication. *Id.* (citing *St. Amant v. Thompson*, 390 U.S. 727, 730-31, 88 S. Ct. 1323, 20 L. Ed. 2d 262 (1968)). Although Moe has presented evidence that Robbins did not ad-

---

[5]The drafters of the RESTATEMENT, *supra*, § 600, published in 1977, were concerned that the negligence standard for private figure plaintiffs set forth in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974), failed to provide adequate protection for qualified privileges. RESTATEMENT, *supra*, § 580B cmt. 1; § 592A, at 260; *see Banas v. Matthews Int'l Corp.*, 348 Pa. Super. 464, 502 A.2d 637, 639 n.1 (1985) (qualified privileges meaningless under negligence standard). Thus, to support the public policy underlying all qualified privileges—the protection of the exchange of information—they wrote RESTATEMENT § 600 so as to require a private figure plaintiff to show an abuse of a qualified privilege by actual malice: knowledge of falsity or reckless disregard as to the truth. RESTATEMENT, *supra*, § 592A, at 260. *See Bratt v. International Bus. Mach. Corp.*, 392 Mass. 508, 467 N.E.2d 126, 132 (1984) (RESTATEMENT, *supra*, § 600 requires showing of malice to prove abuse by excessive publication); *Caruso*, 107 Wn.2d at 539 (Andersen, J. dissenting) (approving jury instruction requiring clear and convincing evidence of abuse *and* malice).

equately investigate the defamatory allegations, that fact alone will not establish actual malice. *Herron* II, 112 Wn.2d at 777. Further, there is no evidence that Robbins acquired information that caused him to doubt the truth of the allegations. *Cf. id.* at 776-77 (media reporter acts in reckless disregard when his investigation does not support his false statement or brings to his attention facts that rebut the false statement). Nor does Moe's assembled evidence show actual malice or that Robbins harbored any ill will toward Moe. *Cf. Herron* I, 109 Wn.2d at 525. (publisher's repeated acts of hostility toward plaintiff probative of actual malice); *see also Herron* II, 112 Wn.2d at 779 (malice in the colloquial sense of hostility is relevant to malice in the legal sense). Thus, the trial court correctly concluded that Moe had failed to establish a prima facie case of abuse through knowledge of falsity or reckless disregard as to the truth.

b. Acting to Protect Interest Underlying Privilege

To show that Robbins did not act for the purpose of protecting the interest underlying and supporting the privilege, RESTATEMENT, *supra*, § 603, Moe needed to present evidence that Robbins had an ulterior purpose in writing to the creditors, such as damaging the business. *Kass v. Great Coastal Express, Inc.*, 291 N.J. Super. 10, 676 A.2d 1099, 1105 (1996), *aff'd in part*, 152 N.J. 353, 704 A.2d 1293 (1998); *Wildes*, 465 N.W.2d at 840. This sort of evidence is lacking. The evidence indicates that Robbins believed the purpose of the letter was to enlist support for the reorganization plan and that he edited it in an attempt to make it more "palatable" and, thus, more effective in protecting the pecuniary interests of Hoquiam Boat and its creditors. There is no evidence that Robbins abused the qualified privilege by acting for an improper purpose.

c. Excessive Publication

Here, Moe needed to produce evidence that Robbins knowingly published the defamatory matter to a person to whom its publication was not otherwise privileged. *Fore-*

*tich*, 37 F.3d at 1559; RESTATEMENT, *supra*, § 604. Moe claims that sending the letter to hull owners abused the privilege. We disagree.

The hull owners were creditors: they held contracts for uncompleted goods and had an interest in having Hoquiam Boat either complete their contracts or provide monetary or equitable relief. *See* 11 U.S.C. § 101(10) (defining "creditor"). Consequently, sending the letter to hull owners did not abuse the qualified privilege.[6]

d. Objective of Privilege

Here, Moe needed to produce sufficient evidence showing that Robbins did not reasonably believe the letter was necessary to accomplish the purpose of the privilege to facilitate free and open communication between the debtor and its creditors about the cause of the business's failure and the plans to improve its financial health. RESTATEMENT, *supra*, § 605.

The dissent argues that Robbins lacked the requisite belief, relying upon his statement that the proposed letter contained language that "was not constructive" because "credit people are impressed with bottom line arguments, not with name-calling." But, viewed in context, this statement does not show that Robbins did not believe in the need to communicate about the cause and consequences of the business failure.

The quoted statement was only a part of Robbins's testimony; in other testimony, he explained that obtaining the hull owners' agreement to renegotiate the contracts was "certainly very important" to the Chapter 11 reorganization. Given the circumstances, he believed that this was a "reasonable and worthy approach for the company

---

[6]Moe does not argue that Wise's sending the letter to a newspaper reporter establishes that Robbins abused the privilege. In any event, such an argument would have failed because the trial court found that Robbins had no knowledge that Wise was going to send the letter to the press and Moe does not challenge this on appeal. Because knowledge is a necessary element of abuse through overpublication, Robbins cannot be held liable for the letter's publication to the press. RESTATEMENT, *supra*, § 604. The dissent would have us ignore the trial court's unchallenged finding of fact regarding Robbins's lack of knowledge.

management to take" and "that it was in the best interests of the boat customers for the boat shop to be reorganized and . . . getting the trade creditors more active in the bankruptcy would have—would help attain that objective."

Finally, Robbins appeared to be referring to the unedited letter, not to the mailed letter. He explained his participation as follows:

> Seemed to me that the most reasonable option was to do what I had been retained to do as a bankruptcy lawyer, which is to clean the letter up from a bankruptcy perspective and also make it hopefully a little more effective in terms of its intended recipients by taking out some of the bad language.

When asked whether "the trade creditors and the hull owners[] had a common interest in the bankruptcy proceeding and the subjects that were touched on in that letter," Robbins responded, "Absolutely."

■■■ The dissent suggests that a publisher abuses the privilege merely by participating in disseminating information that he believed could have been worded more effectively. We disagree, reading RESTATEMENT § 605 as focusing on a publisher who intentionally includes irrelevant, defamatory matter in what might be otherwise a privileged communication. Here, if the letter had contained statements about Moe's personal life or his involvement in matters unrelated to the subject business, it would be abusive. *See Wildes*, 465 N.W.2d at 840 (plaintiff who failed to show that statement describing her as a poor employee "was not related to the subject" under discussion did not meet her burden of establishing a prima facie case of abuse). But Robbins's concerns about the efficacy of some of the letter's specific language, viewed in context, does not show abuse. The evidence indicates that Robbins reasonably believed in the need for a discussion of the subjects touched upon in the letter. It also shows his belief that sending the letter was an appropriate way to facilitate debtor-creditor communication.

Because the letter contained no discussion of matters un-

related to the fiscal condition of the boat shop, Moe has failed to show abuse of the objective underlying the privilege. *Wildes*, 465 N.W.2d at 840.[7]

e. Publication of Unprivileged Material

Here, Moe needed to produce evidence that Robbins published unprivileged defamatory matter. *Furgason*, 785 P.2d at 254; RESTATEMENT, *supra*, § 605A. As stated above, nothing in the letter is unrelated to Hoquiam Boat's financial situation. *See Wildes*, 465 N.W.2d at 840. Thus, we find no unprivileged defamatory matter.

The evidence here is inadequate for a reasonable trier of fact to find clear and convincing evidence of abuse. *Cf. Bender*, 99 Wn.2d at 602. Because Moe fails to establish a prima facie case of abuse, the trial court did not err in directing a verdict for Robbins. *See Wildes*, 465 N.W.2d at 840. Consequently, we need not discuss Robbins's claim of absolute privilege or his challenge to the lost profits verdict.

## II. Imposition of Terms

Robbins challenges the trial court's imposition of the $5,000 terms as a condition of granting his motion for a continuance. He raised several issues and we granted discretionary review of the following two: (1) that the amount of the sanction was excessive and arbitrary and (2) that the trial court had no authority to direct payment of terms to the food bank.

We review the imposition of sanctions under the abuse of discretion standard. *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wn.2d 299, 338, 858 P.2d 1054 (1993). The court abuses its discretion when it exercises it in a manifestly unreasonable way, on untenable grounds, or for untenable reasons. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

---

[7]The dissent contends that the jury could infer an ulterior purpose from the fact that the letter went to the newspaper. In inviting us to use this evidence to find a prima facie case, the dissent again ignores the trial court's unchallenged finding of fact that Robbins lacked knowledge that the letter was sent.

■ There should be a reasonable relationship between terms and the actual cost of a continuance or the dollar amounts in dispute. *See, e.g., State v. Ralph Williams' N.W. Chrysler Plymouth, Inc.*, 87 Wn.2d 298, 303, 553 P.2d 423 (1976). Such costs could include travel expenses of the opposing party, *Casady v. Anderson*, 90 Wash. 296, 297, 155 P. 1067 (1916); nonrecoverable costs and attorney fees of the opposing party, *Sayler v. Elberfeld Mfg. Co.*, 30 Wn. App. 955, 965, 639 P.2d 785 (1982); payments and taxes due in a forfeiture action, *Peterson v. David*, 69 Wn.2d 566, 569, 419 P.2d 138 (1966); but not juror fees, *Johnson v. Dahlquist*, 124 Wash. 267, 272, 214 P. 157 (1923).

Because there is no indication that the trial court considered the actual cost of the continuance, it appears that the $5,000 figure was an arbitrary amount, unsupported by any legal authority. Consequently, we conclude that the trial court abused its discretion.

Nor is there authority to support the trial court's oral comment requiring Moe to direct payment to a charitable organization. But because the court's written order directed payment to the registry of the court, this issue is not before us.

Thus, we must remand for a recalculation of terms. In calculating terms, the trial court should first determine the total costs that Moe incurred as a result of the continuance. It should then determine and award to Moe the portion of that total that is reasonably related to Robbins's conduct, as opposed to Wise's.

### III. Costs and Attorney Fees

■ Robbins argues that the trial court should have awarded him costs and statutory attorney fees as a prevailing party when it dismissed him from the suit. RCW 4.84.010; *Platts v. Arney*, 46 Wn.2d 122, 128, 278 P.2d 657 (1955). RCW 4.84.010 mandates an award of "certain sums by way of indemnity for the prevailing party's expenses in the action" including statutory attorney fees. "The right to costs is not a matter of procedure but is a substantive

right." *Platts*, 46 Wn.2d at 128. But "[a]ttorney fees may be recovered only when authorized by a private agreement of the parties, a statute, or a recognized ground of equity." *Pennsylvania Life Ins. Co. v. Employment Sec. Dep't*, 97 Wn.2d 412, 413, 645 P.2d 693 (1982).

Here, there was no agreement as to attorney fees, Robbins cites no statute specifically mandating an award of actual attorney fees in a private defamation suit, and we see no equitable principles calling for such an award. Consequently, the trial court correctly denied Robbins an award of actual attorney fees, but erred when it denied him statutory attorney fees and costs allowed under RCW 4.84.010.

Accordingly, we affirm the dismissal of Moe's defamation action against Robbins and remand for a recalculation of terms and for an award of costs.

HUNT, J., concurs.

ARMSTRONG, A.C.J. (dissenting) — I respectfully dissent from the majority's decision holding, as a matter of law, that the "common interest" qualified privilege protected Robbins' defamatory communication and that Robbins did not abuse this qualified privilege.

A qualified privilege to make an otherwise defamatory statement arises when the statement is made to one with a common interest in a particular subject matter. *Ward v. Painters' Local Union No. 300*, 41 Wn.2d 859, 865, 252 P.2d 253 (1953); RESTATEMENT (SECOND) OF TORTS, § 596. Under Washington law, however, "a common interest has been recognized *only* when the communication at issue is made to someone with whom the speaker is allied." *Demopolis v. Peoples Nat'l Bank*, 59 Wn. App. 105, 115 n.10, 796 P.2d 426 (1990) (citing *Ward*, 41 Wn.2d at 865-66; *Parry v. George H. Brown & Assocs. Inc.*, 46 Wn. App. 193, 197, 730 P.2d 95 (1986)) (emphasis added). The majority now extends this limited privilege and holds that a Chapter 11 bankruptcy debtor and its creditors share a common interest in

the business' future financial viability.[8] But the majority position assumes that the debtor and creditors in a Chapter 11 bankruptcy proceeding share the same interests and goals. I believe this result is inconsistent with the bankruptcy code and that a jury must decide both whether the recipients of the letter shared a common interest and, if so, whether the privilege was abused.

Bankruptcy cases frequently involve parties who share common commercial interests, but whose interests in other respects may be very different. "This is especially true when the parties at issue are a debtor in possession under [C]hapter 11 and a committee of creditors. The debtor in possession and the committee of creditors share a duty to maximize the debtor's estate." *In re Mortgage & Realty Trust*, 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997) (citing *In re Kaiser Steel Corp.*, 84 B.R. 202, 205 (Bankr. D. Colo. 1998)). But if creditors are dissatisfied, the committee may move to replace the debtor-in-possession with a Chapter 11 trustee, to convert the Chapter 11 case to one under Chapter 7, to dismiss the Chapter 11 case, or petition the court to compel the debtor-in-possession to act or to gain court permission to institute action itself. *In re Curry & Sorensen, Inc.*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986). Accordingly, the creditors' committee is purposely intended to represent the necessarily different interests and concerns of the creditors it represents and must be a partisan—aiding, assisting and monitoring the debtor pursuant to its own self-interest. *In re Daig Corp.*, 17 B.R. 41, 43 (Bankr. D. Minn. 1981).

The bankruptcy code, 11 U.S.C. § 1102, provides for the appointment of one or more committees of creditors to negotiate the formulation of the plan of reorganization. But because one class of creditors may not sufficiently represent the interests of another class of creditors, the bankruptcy code authorizes the court to appoint additional committees to ensure the adequate representation of all creditors. 11 U.S.C. § 1102(a)(2). The standard of "ade-

[8]*See* Majority op. at 960-61.

quate representation" for purposes of determining whether additional creditor's committees should be appointed, lies not in the uniqueness of a single claim, but in the nature of the case and the composition of the committee. *In re Drexel Burnham Lambert Group, Inc.*, 118 B.R. 209, 212 (Bankr. S.D.N.Y. 1990). "[T]he chief concern of adequacy of representation is whether it appears that different classes of debt and equity holders may be treated differently under a plan and need representation through appointment of additional committees." *Id.* at 212.

In the case of *In re Mansfield Ferrous Castings, Inc.*, 96 B.R. 779 (Bankr. N.D. Ohio 1988), the court considered a motion for the appointment of an additional creditor's committee filed on behalf of debtor's employees. In granting the employees' motion, the court noted: "Additionally, the Committee has raised the issue of whether the Employees are in fact true equity security holders or even creditors of the debtor. This stance of the Committee hardly indicates that it is in a position adequately to represent the interests of the Employees." *Id.* at 781. Thus, bankruptcy law recognizes that not all creditors have the same interest in a bankruptcy proceeding.

The record before us contains evidence that the trade creditors and hull owners did not have a common interest with regard to Hoquiam Boat's bankruptcy action. At trial, Robbins testified that the hull owners opposed the Chapter 11 action. But Robbins also testified that he believed the hull owners and trade creditors had a common interest in the bankruptcy proceeding. The language of the letter to the trade creditors illustrates the respective positions of the parties:

> At the present time, certain purchasers of boats have attempted to gain an advantage by making UCC-1 filings after Hoquiam became insolvent. We are taking steps to prevent this and I will keep you advised of the status. Our request to cancel certain of the boat contracts is being heard in Federal Court . . . . You may wish to be present or to have a representative present to urge the court to authorize cancellation of the contracts. . . .

> The beneficiaries of Hoquiam Boat Shop's activities over the past two years are Moe and those that have taken delivery of completed boats at below cost prices without the owner's awareness, and those with boats in varying degrees of completion who would have us continue performing on sub-standard contracts. . . . Additionally, the trade creditors of Hoquiam Boat Shop have also sufferred [sic]. Their reward for being a loyal supplier of equipment and components, under unsecured conditions, has been late payments and broken promises.

Clearly, the letter blames the hull owners, in part, for the financial difficulties and accuses them of attempting to gain an advantage over the trade creditors in the bankruptcy action. The letter also urges the outside creditors to join the debtor in seeking to cancel the hull owners' contracts. Thus, the language of the letter alone supports the inference that the trade creditors and hull owners did not have a "common interest" in the bankruptcy action. In fact, the letter suggests that as to at least one issue, the hull owners and the trade creditors were adversaries with antagonistic interests. While the outside creditors and the debtor may have shared a common interest in maximizing the boat Shop's assets, the hull owners were interested in getting the boats they had contracted for. And the pursuit of this interest could well deplete the assets of Hoquiam Boat. The letter recognized this conflict and accordingly urged the outside creditors to support canceling the contracts.

In holding as a matter of law that the common interest privilege applies, the majority ignores this conflict in the evidence and our duty to construe the evidence in favor of Moe, the nonmoving party. *See Bender v. City of Seattle*, 99 Wn.2d 582, 587, 664 P.2d 492 (1983) (appellate court reviews ruling on directed verdict in the light most favorable to the nonmoving party). I would hold that the trial court erred in deciding, as a matter of law, that there was a common interest between the trade creditors and hull owners. Because of the conflicting evidence, the trial court should have submitted the issue to the jury. *See* RESTATE-

MENT, *supra*, § 619(1) cmt. a (although the existence of a privilege is ordinarily a question for the court, if the facts are in dispute, the jury considers the evidence and passes upon the issues raised); *Pate v. Tyee Motor Inn, Inc.*, 77 Wn.2d 819, 822-23, 467 P.2d 301 (1970) (Neill, J. concurring); *Getchell v. Auto Bar Sys. Nw., Inc.*, 73 Wn.2d 831, 837, 440 P.2d 843 (1968).

I also disagree with the majority's conclusion that, as a matter of law, Robbins did not abuse the common interest qualified privilege. The question of whether a speaker abused a privilege is for the jury to determine "unless the facts are such that only one conclusion can reasonably be drawn." RESTATEMENT, *supra*, § 619(2) cmt. b.

Acting to Protect Interest Underlying Privilege

The majority concludes that there is no evidence Robbins abused the privilege by acting for an improper purpose. "The evidence indicates that Robbins believed the purpose of the letter was to enlist support for the reorganization plan and that he edited it in an attempt to make it more 'palatable' and, thus, more effective in protecting the pecuniary interests of Hoquiam Boat and its creditors."[9] But Robbins actually testified that the "underlying objective" of the letter was to enlist the *trade creditors'* support for the reorganization plan. And when asked if there was an additional reason he advised against sending the letter, "other than [its] invective and incendiary nature," Robbins testified that "I didn't think that the sending of that kind of a letter was going to accomplish what the underlying objective was."

"[P]ublication to improper persons may justify the conclusion, as a matter of fact, that the defendant has not acted for the purpose for which the privilege is given, but by reason of some other motive not within the privilege." RESTATEMENT, *supra*, § 604 cmt. c. As Robbins testified that the purpose of the letter was to enlist *trade creditors'* support, the publication of the letter to the *hull owners* clearly

---

[9]Majority op. at 966.

supports a finding that Robbins did not act for the purpose for which the privilege was given. Further, because the letter was sent to a newspaper reporter, a jury could reasonably infer an ulterior purpose.[10]

Excessive Publication

The majority summarily concludes that because the hull owners were "creditors" in the broad sense of the term, Robbins' act of sending the letter to the hull owners did not constitute excessive publication. This reasoning cannot be reconciled with Robbins' testimony that the purpose of the letter was to enlist *trade creditors'* support for the reorganization plan. If this was in fact the purpose of the letter, the publication of the letter to the hull owners constitutes an abuse of the privilege. *See* RESTATEMENT, *supra*, § 604 cmt. c.

Further, the majority's reasoning ignores the plain language of the letter. Although the letter blames the hull owners for the business's financial difficulties and accuses them of attempting to gain an advantage over the trade creditors in the bankruptcy action, the majority concludes that the purpose of the letter was to enlist the support of *all* creditors. But the letter's inflammatory accusations against the hull owners make it difficult to conclude that its purpose was to enlist their support. At least a jury could so conclude. Accordingly, I would hold that the issue of abuse by excessive publication should have been submitted to the jury.

In conclusion, I would remand for the submission of these issues to the jury. If the jury determines the hull owners and trade creditors shared a common interest, the qualified

---

[10]Moe does not challenge the trial court's finding that Robbins had no knowledge the letter would be sent to the press. Nevertheless, the fact that the letter was sent to the press is relevant in determining whether Moe presented clear and convincing evidence of an ulterior purpose.

privilege would protect Robbins' communication, assuming the jury also finds Robbins did not abuse this privilege.

Review denied at 140 Wn.2d 1025 (2000).