# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DEBRA KOSHELNIK and GLEN TURNER
individually and the marital community
consisting thereof: and The Estate of
EVELYN KOSHELNIK, through DEBRA
KOSHELNIK as personal representative
thereof,

Appellants,

v.

STATE OF WASHINGTON,
DEPARTMENT OF SOCIAL AND
HEALTH SERVICES (DSHS), SUSAN N.
DREYFUS, Secretary of DSHS, LINDA
ROLFE, Director, Division of
Developmental Disabilities of DSHS;
CONNIE WASMUNDT, EVELYN
CANTRELL, LOREN JUHNKE, and
BARBARA UEHARA, employees of DSHS
and unknown supervisors and managers
of said employees to be named,

Respondents.

No. 75032-1-I

DIVISION ONE

UNPUBLISHED OPINION

FILED: June 20, 2016

APPELWICK, J. — Debra and her husband provided care to three children with Down Syndrome and Debra's elderly mother, Evelyn, and her brother. The Department investigated Debra after first receiving a report that Debra hit one of

the children. As a result of this investigation, the Department entered a substantiated finding of abuse against Debra. The Department then later received a report that Debra was not properly caring for Evelyn, a vulnerable adult. A Department investigator interviewed Evelyn. Evelyn had a stroke that same day and subsequently died. Appellants filed a complaint against the Department and its employees, alleging, among other causes of action, negligent investigation, defamation, outrage, conspiracy, and violations of civil rights. The trial court granted the Department summary judgment as to all claims. Appellants either fail to state a claim upon which relief can be granted or fail to provide sufficient evidence to show that there are genuine issues of material fact as to those claims. We affirm.

## FACTS

Debra Koshelnik and Glen Turner are married. In 2007, they lived with their two adopted children (Virginia, Morgan), their child through the legal guardianship process (Parker), Debra's[1] parents (Edward Koshelnik and Evelyn Koshelnik), and Debra's brother (Daniel Koshelnik). Daniel, Virginia, Morgan, and Parker all have Down Syndrome. Debra has been Daniel's caregiver for many years. Debra chose to adopt the children specifically because she has a calling to provide care to individuals with Down Syndrome. Both Daniel and Parker are clients of the Department of Social and Health Services (Department) Division of Developmental

---

[1] We refer to the Koshelniks by their first names for the sake of clarity. No disrespect is intended.

2

Disabilities (DDD). They receive personal care services from DDD. Their personal care provider was Debra. Debra entered into a client service contract[2] with the Department in May 2005.

Both of Debra's parents are deaf. Consequently, she grew up in a deaf household and uses American Sign Language (ASL). Debra is not deaf, is articulate in the English language, and has served as an interpreter between her deaf relatives and other hearing persons.

## I. The First Incident

On February 8, 2007 as Virginia was preparing to go to school, there was an altercation between Virginia and Debra. Virginia, who was "mouthing off" and being sassy, stuck her tongue out at Debra. Debra approached Virginia and cautioned her to stop. When Virginia continued, Debra yelled at her never to do that, poked Virginia's chest with a finger and attempted to "pop" Virginia's tongue with her hand in a "stop" motion. At that time, Virginia turned her head and Debra's hand hit Virginia's cheek.

Turner was waiting at the car and did not see the altercation. When Virginia came to the car, she was crying, rubbing her cheek, and said, "Mom hit me." Virginia then went to school and told an educational assistant that her mom had hit her. Virginia told other people at school about the altercation with Debra. The

---

[2] The client service contract, in general, relates to payment by the Department for authorized services rendered to the Department's clients. The contract includes detailed requirements regarding responsibilities of the provider both with respect to provision of care to clients and with respect to meeting the Department's procedural, training, and other requirements.

assistant principal contacted Adult Protective Services (APS)[3] on February 9, 2007. APS is also a division of the Department. See RCW 74.34.067(8).

APS conducted an investigation. APS representative Corinne Wasmundt went to Virginia's school to interview her on February 14, 2007. Evelyn Cantrell, Department Attorney and Legal Benefits Advisor, was also present during the meeting with Virginia. On February 27, 2007, Wasmundt went with Olympia Police Officer, Ed Dawson, to the Koshelnik home. Cantrell was also present as an observer. Wasmundt and Dawson interviewed Debra. According to Wasmundt, during the interview, Debra admitted to slapping Virginia and poking her in the chest. According to Officer Dawson, Debra gave Virginia a gentle pop in the mouth and a gentle poke to the chest. He did not feel that Virginia was ever in danger, but because the facts of the case met the elements for domestic violence, he was required to report the incident to the prosecutor's office. The prosecutor did not press charges.

Debra informed DDD case workers Kris Jorgensen-Dobson and Barbara Uehara that she was being investigated by APS. On February 28, 2007, Jorgensen-Dobson received a phone call from Wasmundt at APS. Wasmundt told Jorgensen-Dobson that she would be substantiating the allegation of domestic

---

[3] The school contacted APS, because Virginia was 18 years old and is therefore not considered a child. See RCW 26.44.020(2) (under the child abuse statute a child is any person under the age of 18). A "vulnerable adult" includes a person who has a developmental disability—like Virginia. RCW 74.34.020(21).

violence. Uehara also made a note in the file indicating that she understood that Debra had admitted to striking a client[4] on the face.

On March 14, 2007, Uehara issued a notice to Parker stating that effective March 15, 2007, DDD was terminating payments to his care provider—Debra. The notice stated that DDD was taking that action, because of a reported allegation of abuse or neglect to a vulnerable adult that is under investigation with APS. The notice stated that Parker remained eligible for personal care services, but that he had to choose another qualified provider. The Department sent a similar notice to Daniel.

On April 2, 2007, Daniel and Parker requested a hearing and agreed to consolidate their hearings. Debra continued providing personal care services to Daniel and Parker even though she was not being paid. An administrative hearing was held on May 21, 2007.

After conducting the hearing, the Administrative Law Judge (ALJ) issued a decision on June 1, 2007. ALJ Rebekah Ross concluded that the light smack Debra gave to Virginia did not constitute abuse under the relevant statute and regulations. Consequently, the ALJ concluded that the Department erred in denying Daniel and Parker their choice of care provider and it reversed the Department's decision to deny Debra as their care provider.

---

[4] Virginia is also a DDD client and is thus eligible for DDD services, but was not receiving services during the time periods at issue.

Then, on June 4, 2007, APS notified Debra that it had made a substantiated finding that she had physically abused a vulnerable adult. The notice stated that APS specifically determined that Debra willfully physically abused a vulnerable adult when she punched and slapped Virginia. Debra timely appealed, asserting that ALJ Ross already reversed the Department's denial of payment for care services and found that the incident did not fall within the definition of abuse.

On June 6, 2007—five days after ALJ Ross's final order was issued in Parker's and Daniel's appeal, reversing the Department's decision to deny their choice of provider—the Department again notified Parker that it was terminating Debra's client service contract. On June 24, 2007, Parker again appealed the denial.

While Parker's second appeal was pending, ALJ Jamie Moore held a hearing on Debra's appeal in January 2008, considering whether APS's substantiated finding of abuse should be reversed. On March 19, 2008, the ALJ issued an order, concluding that the preponderance of the evidence in the hearing record did not establish that Debra's action, when she attempted to pop Virginia on the tongue and then poke Virginia in the chest, constituted abuse under the relevant statute. Consequently, the ALJ reversed the Department's substantiated finding of abuse.

The Department filed a petition for review of this order on May 14, 2008. While that appeal was pending, Parker's appeal challenging the Department's decision to terminate Debra's client service contract continued. On June 20, 2008,

Parker filed a motion for summary judgment, contending that the Department's decision to deny his choice of Debra as his care provider was barred by res judicata. A hearing was held on this matter on July 17, 2008 before ALJ Ross.

On August 18, 2008, ALJ Ross granted Parker's motion for summary judgment. ALJ Ross noted that although the evidence about the February 8, 2007 incident would be the same type of evidence presented in this action, a new significant item of evidence could exist—an APS substantiated finding of abuse against Debra. But, in determining whether the APS substantiated finding of abuse was sufficient new evidence to defeat res judicata, ALJ Ross considered the fact that the APS finding had been reversed after a full administrative hearing. She concluded that the issue of whether Debra abused Virginia had been resolved in Debra's favor in Parker's appeal and collateral estoppel would bar the Department from injecting that issue into the proceedings unless and until ALJ Moore's order was reversed on appeal.

Shortly thereafter, on August 27, 2008, the Department's Board of Appeals affirmed ALJ Moore's initial order reversing the APS's substantiated finding of physical abuse against Debra. APS did not seek further review of this decision.

II. The Second Incident

On January 4, 2010, roughly a year and a half later, APS received a report that Debra was mentally abusing Evelyn. At the time, Evelyn was 85 years old and her husband had recently passed away. The reporter stated that the

7

conditions in the Koshelnik home were filthy, that Evelyn is confined to her room until Debra lets her out, and that Debra yells at Evelyn through sign language.

Consequently, the Department assigned Loren Juhnke to investigate. Juhnke went to the Koshelnik household unannounced with a female interpreter and told Debra that he needed to speak with Evelyn concerning the report of abuse. Debra told Juhnke that Evelyn was in an emotionally and physically fragile state and that any high stress contact would be frightening and dangerous to her. Juhnke informed Debra that he was going to interview Evelyn anyway. And, he did not allow Debra to remain in the room during the interview. Juhnke documented the visit with Evelyn and concluded that the report of possible mistreatment was unsubstantiated. He noted that Evelyn stated she had a wonderful family and that her room was clean and free of clutter.

Debra went to check on Evelyn within minutes after Juhnke left. Evelyn told Debra that she loved her and repeated, "I'm staying" and "this is my home" several times. Debra tried to calm Evelyn down, but it did not work. Evelyn then had a stroke. By the time they got to the emergency room, Evelyn was unconscious. Evelyn did not regain consciousness and died the next day.

III. The Lawsuit

On June 7, 2011, Debra—individually and as personal representative of Evelyn's estate (the Estate)—and Turner (collectively "appellants") filed a complaint against the Department, the Secretary of the Department (Susan Dreyfus), the Director of DDD (Linda Rolfe), Wasmundt, Cantrell, Juhnke, and

Uehara. The appellants alleged 12 causes of action. Specifically, they brought claims for the wrongful death of Evelyn, conspiracy, defamation, outrage, and violation of federal civil rights. On July 14, 2011, the Department responded,[5] denying all allegations against it.

Nearly two years later, on June 7, 2013, the Department filed a CR 12(b)(6) motion to dismiss and an alternative motion for summary judgment as to the wrongful death and other claims raised on behalf of only the Estate. In response, appellants filed exhibits including declarations, the administrative rulings, and other supporting evidence. On July 12, 2013 the trial court granted the Department's motion and dismissed all of the appellants' claims related to the Estate. The trial court then denied appellants' motion for reconsideration.

In the meantime, on August 22, 2013, the Department moved for summary judgment as to all of appellants' remaining claims. The trial court granted the Department's motion for summary judgment as to appellants' remaining claims on March 27, 2015. The appellants appeal.

## DISCUSSION

Appellants argue that the trial court erred when it granted both of the Department's motions. The Department's first motion was a CR 12(b)(6) motion to dismiss and an alternative motion for summary judgment. The Department's second motion was a motion for summary judgment. Because the appellants

---

[5] We refer to the Department defendants collectively as "the Department" except where appellants' claims are against specific individual defendants.

submitted evidence outside the pleadings in response to the Department's first motion, and because the trial court did not exclude it, we treat both of the trial court's orders as dismissals on summary judgment. See Granville Condo. Homeowners Ass'n v. Kuehner, 177 Wn. App. 543, 550-51, 312 P.3d 702 (2013) (stating that a motion to dismiss for failure to state a claim is treated as a motion for summary judgment when matters outside the pleadings are presented to and not excluded by the court).

This court reviews summary judgment orders de novo. Hadley v. Maxwell, 144 Wn.2d 306, 310-11, 27 P.3d 600 (2001). Summary judgment is appropriate only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c); Peterson v. Groves, 111 Wn. App. 306, 310, 44 P.3d 894 (2002). An appellate court may affirm a trial court's disposition of a summary judgment motion on any basis supported by the record. Davies v. Holy Family Hosp., 144 Wn. App. 483, 491, 183 P.3d 283 (2008).

When considering the evidence, the court draws reasonable inferences in the light most favorable to the nonmoving party. Schaaf v. Highfield, 127 Wn.2d 17, 21, 896 P.2d 665 (1995). However, a nonmoving party may not rely on speculation or on argumentative assertions that unresolved factual issues remain. White v. State, 131 Wn.2d 1, 9, 929 P.2d 396 (1997). In a summary judgment motion, the moving party bears the initial burden of showing the absence of an issue of material fact. Young v. Key Pharmaceuticals, Inc., 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If the moving party is a defendant and meets the initial

showing, then the inquiry shifts to the party with the burden of proof at trial—the plaintiff. Id. The defendant may meet this initial burden by pointing out that there is an absence of evidence to support the nonmoving party's case. Id. at 225 n.1. If, at this point, the plaintiff fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, then the trial court should grant the motion. Id. at 225. In making this responsive showing, the nonmoving party cannot rely on the allegations made in its pleadings. Id. The response by affidavits or as otherwise provided in CR 56(e) must set forth specific facts showing that there is a genuine issue for trial. Id. at 225-26. Because the defendants met their initial burden by pointing out that there was an absence of evidence to support the appellants' case, to defeat summary judgment and to prevail in this case, the appellants had the burden of establishing through admissible evidence that there was a material issue of fact as to every element of their claims.

The appellants also argue that the trial court erred when it denied its motion for reconsideration as to the claims relating to Evelyn's death. Motions for reconsideration are addressed to the sound discretion of the trial court, and a reviewing court will not reverse a trial court's ruling absent a showing of manifest abuse of that discretion. Wagner Dev., Inc. v. Fid. & Deposit Co. of Md., 95 Wn. App. 896, 906, 977 P.2d 639 (1999).

11

I. Claims Related to Evelyn's Death

We begin by addressing appellants' claims that were dismissed through the trial court's first order granting summary judgment—all of the claims against the Department that related to Evelyn's death.

The appellants' complaint alleged several facts about APS investigator Juhnke's interview with Evelyn. The complaint noted that rather than investigating the source of the allegations against Debra's care of Evelyn, the Department sent an APS agent to interrogate Evelyn—implying that this was premature. And, the complaint stated that, "To this 85-year-old frail deaf woman they sent a poorly trained but imposing six foot tall man, Loren Juhnke, whose presence and the nature of his questioning literally terrified [Evelyn] to death." The complaint alleged that supervisors or APS agents with basic knowledge or adequate training would have known that their tactics, including using an ASL interpreter unknown to Evelyn, would cause life threatening anxiety to a person in Evelyn's condition. The complaint noted that the Department's ASL interpreter—the interpreter who was present during Evelyn's interview—confirmed that, in her opinion, questioning an elderly deaf woman with a strange interpreter would in fact likely cause her great anxiety. And, it stated that Evelyn's hemorrhagic stroke—and death the next day—was caused by the "terror generated by the interview."

A. Negligent Investigation – The Department and Juhnke

On appeal, the appellants cite to Debra's declaration and contend that Juhnke's "questioning did, in fact cause [Evelyn's] death by a massive stroke which

occurred within minutes of his ending an ill-conceived interview, the dangers of which he was clearly warned." The appellants claim that Juhnke's gross negligence during the investigation caused Evelyn's death.

In general, Washington common law does not recognize a claim for negligent investigation because of the potential chilling effect such claims would have on investigations. Janaszak v. State, 173 Wn. App. 703, 725, 297 P.3d 723 (2013). We have refused to recognize a cognizable claim for negligent investigation against law enforcement officials and other investigators. Id. Washington courts have only recognized a negligent investigation claim against the Department's caseworkers investigating child abuse pursuant to their specific statutory duty to investigate. Id.

The cases that have recognized such a claim involve allegations that the Department failed to adequately investigate a child's living situation before making a decision to remove a child from a home or place a child in a home. M.W. v. Dep't of Soc. & Health Servs., 149 Wn.2d 589, 595, 70 P.3d 954 (2003). But in M.W., the court rejected the plaintiff's attempt to broaden the duty to investigate after parents sued, claiming that Department investigators inappropriately touched their daughter's genitals during the course of a child sexual abuse investigation. Id. at 592, 595-96, 598, 601. Specifically, the M.W. court considered whether the statutory purpose of the child abuse statute supports a broader duty to protect children from harm that is the result of direct negligence by Department

investigators during the course of an investigation, such as dropping a child or negligently inflicting emotional harm. Id. at 598.

The M.W. court engaged in this inquiry, because of the test outlined in Bennett v. Hardy, 113 Wn.2d 912, 919, 784 P.2d 1258 (1990), to determine whether we may infer a cause of action from a statutory duty. M.W., 149 W.2d 596. The Bennett court recognized that when the legislature creates a duty, we may provide a remedy for its breach if the remedy is appropriate to further the purposes of the statute and is needed to assure its effectiveness. Id. To determine whether an implied cause of action was warranted, the Bennett court adopted the approach used by federal courts, which requires us to determine, among other factors, whether the underlying purpose of the legislation is consistent with inferring a remedy. Id. The M.W. court ultimately held that a cause of action from a statutory duty is limited by the harm the statute is meant to address. Id. at 602. It declined to expand the cause of action because the child abuse statute from which the tort of negligent investigation was implied does not contemplate the type of harm that could result directly from investigators. Id.

Here, the Department had a statutory duty to investigate. See RCW 74.34.063(1) (stating that the Department shall initiate a response to a report of abuse of a vulnerable adult no later than 24 hours after knowledge of the report). No Washington case has decided that a negligent investigation claim exists relative to this statute. We need not do so here.

14

Even if we were to assume that a claim for negligent investigation extends to APS investigations, and even if Juhnke's simple presence or behavior somehow constituted an improper investigation, M.W. requires us to consider the harm the vulnerable adult statute is meant to address. The purpose of chapter 74.34 RCW is to provide the Department and law enforcement agencies with the authority to investigate complaints of abuse or neglect of vulnerable adults by family members, caregivers, and others with whom they have a relationship, and to provide protective services to protect these vulnerable adults. See RCW 74.34.005 (stating the legislature's findings); SUBSTITUTE H.B. 1620, at 1, 56th Leg., Reg. Sess. (Wash. 1999). Nothing in the act hints at a purpose of protecting vulnerable adults from the Department or creating a cause of action in tort against the Department for the manner in which its personnel carry out the statutory mandate.

Even if we were to recognize that appellants could bring a claim for negligent investigation against Juhnke in this context, causation is a required element of a negligent investigation claim. See Tyner v. Dep't of Soc.& Health Servs., 141 Wn.2d 68, 82-83, 1 P.3d 1148 (2000). The trial court found that appellants did not present a prima facie case of causation between Juhnke's acts and Evelyn's death. We agree.

To survive summary judgment, the plaintiff's showing of causation must be based on more than mere conjecture or speculation. Miller v. Likins, 109 Wn. App. 140, 145, 34 P.3d 835 (2001). Therefore, to survive summary judgment, appellants would have to demonstrate that there is an issue of material fact as to

whether Juhnke's investigation caused Evelyn's stroke and eventual death. It is not disputed that Evelyn was agitated after the interview. But, there was no evidence that her stroke and subsequent death were caused by the agitation from the interview—it is mere speculation.

Appellants' complaint stated in a conclusory fashion that the interview caused Evelyn's blood pressure to spike, leading to a stroke within minutes of the interview. It also asserted that the Department's interpreter later confirmed[6] that, in her opinion, questioning an elderly deaf woman with a strange interpreter would likely cause her great anxiety. In its memorandum in opposition to the Department's motion for summary judgment, appellants cited to the declaration of Allie Joiner, an advocate for deaf persons. Joiner asserted that an interview like the one at issue here would likely cause a deaf interviewee anxiety. She concluded that conducting the interview and the manner in which it was conducted was grossly negligent. Significantly, Joiner's declaration did not assert that the interview—or the anxiety stemming from the interview—caused Evelyn's death. Nor was any medical testimony supporting such causation offered.

On appeal, appellants cite to Debra's declaration, which outlines the timeline of events between when Juhnke left and when Evelyn had a stroke. It also cites to literary references to support its assertion that it provided enough facts to survive summary judgment on the basis of causation. This argument asks to

---

[6] There is no declaration from the interpreter in the record to support this assertion.

allow a jury to speculate that due to the temporal proximity of the events that there was cause and effect. It is insufficient to establish causation. Appellants did not meet their burden to provide evidence to support every element of this claim. Young, 112 Wn.2d at 225. We hold that the trial court properly dismissed appellants' negligent investigation claim on summary judgment.

Appellants also claim that the trial court erred when it denied its motion for reconsideration on the order granting the Department summary judgment as to these claims. Appellants assert only that denial of their motion was improper because their expert, Joiner, had stated that the Department's practice of sending an APS agent who was not himself ASL fluent would be distressing to an interviewee. The trial court was already duty bound to accept the allegation that the interview caused anxiety as true for purposes of summary judgment. See Schaaf 127 Wn.2d at 21 (stating that when considering the evidence, the court draws reasonable inferences in the light most favorable to the nonmoving party). The declaration adds nothing to prove the distress caused the death. We see no basis on which to conclude that denial of reconsideration was an abuse of discretion.

B.    Negligent Training – Susan Dreyfus

Appellants also assert a cause of action for negligent training against Susan Dreyfus—the Secretary of the Department. Appellants assert that no one in the chain of command seemed to know that it is always dangerous practice to send an official investigator without ASL skills to interview an elderly deaf woman. And,

that this ignorance led to Evelyn's death. Appellants assert "[t]his is an equal protection claim and a denial of life without due process." Appellants ostensibly raise this as a 42 U.S.C. § 1983[7] (§ 1983) cause of action. Appellants also assert that "it is a discrimination claim under [chapter] 49.60 [RCW]."

The basis of the appellants' negligent training argument on appeal is confusing. In the event that appellants intended their negligent training argument to be a state law claim—as it alleged below—we will address that here. In Washington, a cause of action for negligent training requires a plaintiff to show that a subordinate employee acted outside the scope of his or her employment. See LaPlant v. Snohomish County, 162 Wn. App. 476, 479-80, 271 P.3d 254 (2011). When an employee commits negligence within the scope of employment, a different theory of liability—vicarious liability—applies. Id. Therefore, under Washington law, a claim for negligent training is generally improper when the employer concedes the employee's actions occurred within the course and scope of employment. Id. at 480. Here, the Department has conceded that the individual

---

[7] The statute states in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

defendants, including Junkhe, were acting within the scope of their employment at the time of the events in question. To the extent the claims under §1983 and chapter 49.60 RCW are based on negligent training, they fail.

Moreover, there is no indication in the record that the appellants raised § 1983 claims and claims under chapter 49.60 RCW below against Dreyfus based on a theory of negligent training. Therefore, these specific claims are being raised for the first time on appeal.

The general rule is that appellate courts will not consider issues raised for the first time on appeal. Eyman v. McGehee, 173 Wn. App. 684, 698, 294 P.3d 847 (2013). RAP 2.5(a)(3) provides an exception to the general rule that parties cannot raise new arguments on appeal. State v. WWJ Corp., 138 Wn.2d 595, 602, 980 P.2d 1257 (1999). We construe the exception narrowly by requiring an appellant seeking review to identify (1) a constitutional error and (2) how the alleged error actually affected appellants' rights at trial. Id.; Eyman, 173 Wn. App. at 698-99. RAP 2.5(a)(3) was not designed to allow parties a means for obtaining new trials whenever they can identify a constitutional issue not litigated below. Eyman, 173 Wn. App. at 699. If the record from the trial court is insufficient to determine the merits of the constitutional claim, then the claimed error is not manifest and review is not warranted. Id. Because appellants fail to show why these claims are manifest constitutional errors warranting review under RAP 2.5(a)(3), we decline to consider them for the first time on appeal.

## II. Remaining Claims

Appellants' remaining claims involve the Department's investigation into Debra's alleged abuse against Virginia and the related termination of personal care payments. Appellants claim that individual employees within the Department defamed the Koshelnik family, engaged in outrageous behavior, conspired against the Koshelnik family, and violated their federal due process rights. The trial court dismissed all of these claims on summary judgment.

As to the federal claims, the trial court stated that it struggled to connect the appellants' specific allegations with evidence to each of the named defendants. It noted that with regard to the state law claims, appellants did not provide sufficient evidence to defeat summary judgment, and it found that there were no genuine issues of material fact that precluded summary judgment dismissal. Appellants assert that the trial court erred when it granted the Department's motion for summary judgment as to these claims.

### A. Defamation – Department Employees

In their complaint, appellants alleged that Department employees spread defamatory information about their case within the Department including the falsehood that Virginia showed up to school with visible injuries. In its motion for summary judgment, the Department asserted, among other things, the dissemination of the information within the Department was subject to a privilege that shielded it from liability.

20

On appeal, appellants argue that, "[p]lacing in the public record an interagency communication as 'substantiated' a finding that Debra had abused her vulnerable adult daughter after 1) a[] finding by an administrative tribunal that she had not, and 2) with no new evidence, with the malicious intent to damage her ability to ever be employed for compensation at her calling such that the agency could continue to receive her services for free, defeats any possible qualified privilege or immunity and establishes all of the elements [of defamation]."

In order to make out a prima facie case of defamation, a plaintiff must prove falsity, an unprivileged communication, fault, and damages. Robel v. Roundup Corp., 148 Wn.2d 35, 55, 59 P.3d 611 (2002). Washington recognizes a qualified privilege for the protection of common interests. Moe v. Wise, 97 Wn. App. 950, 957-58, 989 P.2d 1148 (1999). The common interest privilege applies when the declarant and the recipient have a common interest in the subject matter of the communication. Id. This privilege generally applies to organizations, partnerships, and associations and arises when parties need to speak freely and openly about subjects of common organizational or pecuniary interest. Id. at 958-59. The publications generally must be made to a specific group sharing a common interest, rather than the general public. See Momah v. Bharti, 144 Wn. App. 731, 747-48, 182 P.3d 455 (2008). At the hearing on the Department's second motion for summary judgment, appellants conceded that the publication of the alleged defamatory statements were made only internally within the Department. The alleged defamatory statements were made by employees of the Department to

employees of the Department. We conclude that even if appellants made out a prima facie case of defamation, the common interest privilege applies here.

The appellants appear to concede that the common interest privilege applies, arguing instead that the qualified privilege can be defeated. A qualified privilege may be lost if it can be shown that the privilege has been abused. Moe, 97 Wn. App. at 963. The defendant abuses the qualified privilege if he or she knows the matter to be false or acts in reckless disregard as to the truth or falsity of the statement. Id. at 963. The appellants argue that placing in the Department's records, with malicious intent, a substantiated finding that Debra had abused her vulnerable adult daughter, after an administrative tribunal decided that she had not, defeats any possible qualified privilege.

The appellants characterize APS's substantiated finding of abuse as the "false" statement. Ultimately, the appellants are asserting that the finding was false, because the DDD decision had already been challenged and the ALJ rejected the conclusion that the contact between Debra and Virginia constituted abuse. But, in February 2007, months before ALJ Ross determined that the physical contact was not abuse, Wasmundt, from APS, informed DDD case workers that she would be substantiating the allegation of domestic violence. It is clear that APS was performing its own, independent investigation at that time. Appellants do not assert that APS did not have a duty to perform its own investigation or that DDD's inquiry into Debra's client services contract necessitated that APS shrink from that duty and not make its own finding.

22

No evidence in the record establishes which of the individual Department (APS) employees actually made the substantiated finding and internally published it. Appellants assert it was Wasmundt because she was the lead investigator on the case. But, there is no evidence in the record corroborating this fact. Nor is there evidence that the APS employee who ultimately internally published the substantiated the finding of abuse knew of ALJ Ross's decision or acted in reckless disregard of it. Therefore, determining whether the individual who actually made and published the finding knew it to be false or entered the substantiated finding with reckless disregard of that fact cannot be ascertained based on this record without speculation.

Appellants have not met their burden to demonstrate that the qualified privilege was lost. The trial court properly granted the Department's motion for summary judgment as to appellants' defamation claim.

B. Outrage

Below, appellants asserted that outrage had been inflicted on both Evelyn and Debra. On appeal, appellants appear to have abandoned the outrage claim as to Evelyn and focus on the outrage claim as to Debra.

The elements of outrage are generally factual questions for the jury. Sutton v. Tacoma Sch. Dist. No. 10, 180 Wn. App. 859, 869, 324 P.3d 763 (2014). However, a trial court faced with a summary judgment motion must make an initial determination as to whether the conduct may reasonably be regarded as so extreme and outrageous as to warrant a factual determination by the jury. Id. To

establish a claim for the tort of outrage, appellants must demonstrate that (1) Debra suffered severe emotional distress; (2) the emotional distress was inflicted intentionally or recklessly, and not negligently; (3) the conduct complained of was outrageous and extreme; and (4) Debra was the object of the outrageous conduct. See Lewis v. Bell, 45 Wn. App. 192, 194-95, 724 P.2d 425 (1986). The defendant's conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Reid v. Pierce County, 136 Wn.2d 195, 202, 961 P.2d 333 (1998).

Appellants assert that "there was a concerted effort to deprive Debra [of] the resources with which to care for her disabled children by wrongfully branding her an abuser solely to save the State money." They argue that a reasonable person could find such behavior extreme and outrageous. When Parker and Daniel were notified that DDD was terminating payments to Debra, they were informed that they remained eligible for personal care services, but that they had to choose another qualified provider. The evidence does not support an inference that a change of service provider would necessarily save the state money. Any savings would flow from not choosing a different provider.

Appellants also cite to Debra's declaration and note that a finding of substantiated abuse would prevent Debra from ever being employed in caring for persons with disabilities. Debra acknowledged that the Department told her she did not have to disclose on job applications that there was a substantiated finding

of abuse against her because it has been overturned. But, Debra stated that this makes her uncomfortable, and that consequently, she has not applied for any volunteer or paid positions where she would come in contact with adults or children with special needs. Debra's declaration states that this has caused her great distress.

But, to prevail on an outrage claim, a plaintiff is required to come forward with evidence that he or she actually suffered severe emotional distress as a result of the defendant's conduct. Sutton, 180 Wn. App. at 871. Emotional distress includes all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. Id. But, liability arises only when the emotional distress is extreme. Id. at 871-72. Here, appellants have provided no evidence that Debra experienced severe emotional distress. Therefore, the trial court did not err when it granted the Department's motion for summary judgment on the claim of outrage.

C. Due Process – Individual Defendants

Appellants argue that the individual defendants—Uehara, Rolfe, and Wasmundt—violated their substantive due process rights. Appellants ostensibly bring this claim as a deprivation of constitutional rights under § 1983.[8] And,

_____

[8] Appellants' reliance on § 1983 is apparent, because appellants cite to Sintra Inc. v. City of Seattle, 119 Wn.2d 1, 23, 829 P.2d 765 (1992), and Lutheran Day Care v. Snohomish County, 119 Wn.2d 91, 829 P.2d 746 (1992), to support their assertions. Both of these cases involved lawsuits for a deprivation of substantive due process rights under § 1983. Sintra, 119 Wn.2d at 6; Lutheran, 119 Wn.2d at 124-25. Appellants argue that it is clear that "when the state and those that act in its name abuse the established process and procedures to deny

appellants bring these claims against the individual defendants, apparently recognizing that the Department cannot be held liable for violations of § 1983. See Janaszak, 173 Wn. App. at 720 (recognizing that neither a state nor its officials acting in their official capacities are considered persons that may be liable to the injured party under § 1983). However, named individuals—sued in their individual capacities—may be held liable.[9] Smith v. State, 135 Wn. App. 259, 270, 144 P.3d 331 (2006).

The appellants address each individually-named Department defendant one by one. But, rather than asserting alleged due process violations attributable to each defendant, the appellants list only facts about each individual defendant's involvement with the Koshelnik family and make bald assertions about their culpability. Then, in their due process argument section, appellants refer to actions categorically taken by "the Department." As stated above, the Department cannot be held liable for violations of § 1983. See Janaszak, 173 Wn. App. at 720.

Ultimately, all of appellants' claims relate to the fact that the Department required them to defend the same conduct—the claim of abuse by Debra in hitting Virginia—in two separate administrative contexts. The appellants

---

public goods and relationships to which the Plaintiff is lawfully entitled . . . it violates" fundamental due process principles.

[9] We note that appellants' complaint did not specify whether they were suing the individual Department defendants in their individual or official capacities. However, by virtue of the fact that the Department asserted the defense of qualified immunity in its motion for summary judgment, we accept that appellants have sued the defendants in their individual capacity. Indeed, on appeal, the Department appears to concede this point by arguing that the individual defendants are entitled to qualified immunity.

concede that Virginia's allegations of abuse against Debra needed to be investigated. And, they conceded that the initial proceeding brought by DDD during the pendency of the APS abuse investigation was also proper. But, appellants stated that when the Department "went after them again" via the renewed DDD payment proceeding is when the substantive due process violation occurred. The appellants asserted that the sole purpose behind the administrative proceedings was to terminate Debra's payments and save the Department money. The appellants assert that Uehara agreed to improperly use her powers as a DDD case worker to deliberately withhold money from the appellants in order to save the Department money. Uehara issued a notice to Parker stating that DDD was terminating payments to Debra prior to APS's substantiated finding of abuse. Appellants do not assert that this was improper. Rather, appellants cite to an e-mail from a Department supervisor, Dee Nelson, in which Nelson asked Department employees whether there was a way to disallow the Koshelnik family from receiving additional money, because it was already receiving a lot of money from the Department.[10] This e-mail was eventually forwarded to Uehara and she agreed to respond to Nelson's inquiry. However, Uehara responded only that she would respond. There is no additional response from Uehara in the record. In fact, the e-mail in question from Nelson, on which appellants heavily rely, is dated August 10, 2007—about two months after APS made the substantiated finding of

---

[10] Nelson is not a named party to appellants' lawsuit nor do appellants assert that she is a part of the alleged conspiracy.

27

abuse and about five months after DDD began withholding payments from Debra. Therefore, appellants' attempts to suggest that Uehara's actions were a result of Nelson's instruction is not well founded.

The appellants also argue that Uehara's efforts to withhold payments from them and skew the assessment process to save the Department money was clear, because, among other things, Uehara testified at a hearing that there were too many people in the Koshelnik household needing assistance. But, as stated above, simply disqualifying Debra from receiving additional care provider payments would not necessarily save the State money. The Department did not to refuse to provide necessary services. It required a change of provider.

Taken in a light most favorable to Debra, this evidence fails to show a deliberate attempt by Uehara to subject Debra to multiple administrative proceedings and withhold payments to save the Department money. Such a conclusion would be purely speculative. A nonmoving party on a summary judgment motion may not rely on speculation. White, 131 Wn.2d at 9, 17.

As to Rolfe, appellants argue that because she was charged with overall management of Uehara, she was clearly on notice that the Department was repeatedly and unsuccessfully targeting the Koshelniks. But, this claim fails for the same reason the claim against Uehara fails. There only speculative evidence that Uehara was targeting the Koshelniks. Moreover, even if Rolfe could be held liable for Uehara's actions, appellants have provided only speculative evidence that Rolfe was on notice that the Koshelniks were being targeted.

As to Cantrell, the appellants assert that she is culpable for re-prosecuting the substantiated abuse claim without any new evidence when ALJ Ross had found no abuse after a full evidentiary hearing. But, the appellants make no showing that APS lacked the authority or was not duty bound to proceed, even after the initial DDD proceeding, to make its own determination that abuse had occurred. They submit no authority to support the proposition that the two separate Department divisions—APS and DDD—could not lawfully proceed in this manner. In fact, RCW 74.34.068(1) specifically authorizes the Department to make a determination regarding whether the incident of abuse occurred.

Finally, as to Wasmundt, appellants claim in a conclusory fashion that because she was the lead Department investigator, it was her decision to reclassify the incident between Debra and Virginia from suspected abuse to substantiated abuse. On February 28, 2007, a caseworker from DDD received a phone call from Wasmundt. Wasmundt told the caseworker that she would be substantiating the allegation of domestic violence. Appellants do not allege that this initial contact was improper. The record indicates that "APS" notified Debra on June 4, 2007 that it made a substantiated finding of abuse. Even assuming Wasmundt was the APS employee who decided to make the finding, appellants make no showing that it was not Wasmundt's job to do so. Nor do they make a showing that Wasmundt knew or should have known about the finding of abuse made in the other proceeding.

The appellants failed to provide evidence connecting each individual defendant to the repetitive efforts to terminate rights that are alleged to be a constitutional deprivation. We hold the trial court did not err when it granted the Department's motion for summary judgment on appellants' § 1983 substantive due process claims.

D. Conspiracy – Individual Defendants

Finally, appellants argue that individual defendants engaged in a conspiracy to deny Debra the right to contract with the Department to provide paid services to her family. They argue that the evidence is clear to support a claim of conspiracy. They cite to only Nelson's e-mail and the fact that the Department "[r]epeated legal processes."

To establish a claim for civil conspiracy, a plaintiff must prove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) that the conspirators entered into an agreement to accomplish the conspiracy. Woody v. Stapp, 146 Wn. App. 16, 22, 189 P.3d 807 (2008).

Appellants define the unlawful purpose was denying Debra the right to contract with the Department to provide paid services to her family by wrongfully branding her an abuser and secondarily depriving her family members the right to have paid services provided by their chosen qualified provider as required by

federal Medicaid law. The appellants note that conspiracies are generally shown by circumstantial evidence—not direct evidence.

Appellants cite to two factors to support their claim: (1) the e-mail exchange mentioned above between Department employees and (2) the fact that the Department brought repeated legal processes. While the e-mail shows that the Department was concerned with how much it was paying the Koshelnik family, Nelson's e-mail on which appellants predominantly rely to support its conspiracy claim, could not have been a precipitator for the investigations or proceedings. This is because it was sent after both APS and DDD already initiated investigations and proceedings against the Koshelnik family. It is undisputed that Debra struck Virginia. It is undisputed that APS had a duty to investigate the allegation of abuse. It is undisputed that if abuse occurred a service provider would lose eligibility to contract. DDD proceeded to review Debra's service contracts on the initial, unsubstantiated allegations. APS went forward with its separate process of investigating the abuse of Virginia. When it substantiated the abuse, DDD again proceeded to stop services. As noted above, the record does not demonstrate that APS knew the ALJ had determined the incident with Virginia did not rise to the level of abuse, and that it acted with malice or recklessly disregarded that fact when it issued a finding of substantiated abuse. The fact that the ALJ concluded that Debra's actions did not rise to the level of abuse does not support an inference that the Department wrongfully branded Debra as an abuser to deprive her family of her paid services. The appellants do not demonstrate that the later concern

31

expressed in Nelson's e-mail about the amount of money paid to Debra's household was an improper concern. The record in a light most favorable to the appellants does not support that Department employees engaged in unlawful activities or purposes, or engaged in lawful purposes by unlawful means.

We hold that the trial court did not err when it granted the Department summary judgment on these claims.

We affirm.

_Appelwick, J._

WE CONCUR:

_Trickey, ACJ_        _Cox, J._