# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

# DIVISION II

| | |
|---|---|
| LINDSAY MCGINNIS and KEITH MCGINNIS, as individuals and on behalf of the marital community, | No. 59931-7-II |
| Appellants, | |
| v. | UNPUBLISHED OPINION |
| ADVANCED RECOVERY SYSTEMS — DBA Recovery Village Ridgefield dba RECOVERY VILLAGE, a Delaware Corporation; PACIFIC NORTH RECOVERY CENTER LLC, and DANIEL ROA, and DAVID BURSTIN, and AMBER MARTIN, and KEVIN WANDLER, | |
| Respondents. | |

PRICE, J. — Lindsay McGinnis was terminated as a provider for a medical facility. Alleging that the termination was wrongful, she brought a lawsuit that raised several different claims against multiple defendants. The superior court dismissed her complaint on summary judgment.

McGinnis appeals the superior court's order in favor of Advanced Recovery Systems (ARS), Pacific North Recovery Center LLC, and Daniel Roa (collectively the Defendants). McGinnis contends the superior court erred when it dismissed her claims for defamation and discrimination under the Washington Law Against Discrimination (WLAD), chapter 49.60 RCW. We affirm.

FACTS

I. MCGINNIS' EMPLOYMENT AND TERMINATION

McGinnis is a licensed nurse practitioner. In 2019, McGinnis began working for Recovery Village of Ridgefield[1], an ARS facility that provided alcohol rehabilitation services. Roa, also a nurse practitioner, was the associate medical director at Recovery Village. Roa was McGinnis' direct supervisor. Amber Martin was the director of nursing at Recovery Village and was not McGinnis' supervisor.

At the time McGinnis was working at Recovery Village, she was also working at two other health care facilities, Rainer Springs LLC and Monte Nido. Roa was aware of McGinnis' employment with other facilities.

McGinnis' performance was generally good. Her 2019 employment review, completed by Roa shortly after she began at Recovery Village, stated that McGinnis met or exceeded expectations in all categories. Among the comments included in the review were,

[McGinnis] is customer focused and and [sic] really cares about the customers.
. . . .
[McGinnis] is genuinely a caring person and is [sic] demonstrated by compliments from staff and patients alike.
. . . .
[McGinnis] works in a cooperative and collaborative manner.
. . . .
[McGinnis] is a pleasure to work with.

---

[1] Pacific North Recovery Center LLC was the licensed entity doing business in Washington as Recovery Village of Ridgefield. For clarity, we refer to the defendant entity as Pacific North Recovery Center and the facility as Recovery Village.

Clerk's Papers (CP) at 211-14. McGinnis' 2020 annual review reflected a similar quality of work, but identified issues with her dependability and accessibility:

> [McGinnis] is reliable when on the job. She had 8 sick call outs over 12 months and 22 hours of unpaid leave after exhausting her PTO [paid time off] and Sick Leave Banks. I would like to see her dependability improve. The last three months of the year she did not call out and was very flexible with schedule changes.
>
> . . . .
>
> [McGinnis] meets the need of patients. [McGinnis] is often offsite in the afternoons which leaves her team without her. I would like to see [McGinnis] engaging later in the day to build presence.

CP at 219, 221. Despite the concerns with McGinnis' dependability, Roa continued to describe McGinnis as a positive employee and again noted that she was "genuinely a caring person," cooperative and collaborative, and "a pleasure to have as a teammate." CP at 221, 224.

At the beginning of January 2022, the concerns with McGinnis' dependability increased. Roa had been on paid time off for the New Years' holidays and McGinnis had been scheduled to work while Roa was out. There was some uncertainty about when Roa would return to work, but he ended up appearing at the facility on the afternoon of Monday, January 3, to work with the nursing students.

While Roa was at the facility on January 3, the associate clinical director told him that a lot of patients were complaining that they had not been seen by a medical provider. Several patients also complained directly to Roa that they had not been seen. Roa recognized that such complaints were not uncommon and often patients in detox were unaware that they had been seen by a provider. But because the number of complaints was higher than usual, Roa spoke to the associate director of nursing. The associate director of nursing confirmed that she had also heard more complaints than usual, but she speculated that it may have been because McGinnis, who was

3

the provider that should have seen the patients, generally only wore scrubs, and the patients may have believed she was another nurse rather than a nurse practitioner. The associate director of nursing also reported that they were missing some medication orders and that McGinnis had been leaving earlier than normal and was hard to get hold of.

Roa decided to review the security camera footage to determine whether McGinnis had seen the patients she had documented seeing and to resolve the complaints. From 7:00 p.m. until 11:30 p.m. that evening (January 3), Roa reviewed video footage and compiled a written timeline of McGinnis' movements on January 2 and January 3. The video evidence appeared to Roa to be inconsistent with the medical records in which McGinnis documented seeing multiple patients.

Just hours after Roa finished his review of the videos, at approximately 12:30 a.m., Roa received a call informing him that a patient had died at the facility. The medical records reflected that McGinnis had seen the deceased patient earlier on January 3.

Shortly after the patient's death, Roa shared his findings from the video review with David Burstin, the director of human resources for ARS. Burstin reviewed the video footage and confirmed that it supported Roa's timeline and conclusions. Burstin instructed Roa to place McGinnis on administrative leave. Roa then sent his written timeline to Kevin Wandler, the chief medical officer for ARS. McGinnis was terminated from her employment with ARS on January 10.

II. PROCEDURAL HISTORY

In 2023, over a year after her termination, McGinnis initiated this lawsuit against ARS, Pacific North Recovery Center, Roa, Martin, Burstin, and Wandler.[2] McGinnis alleged three causes of action: (1) unlawful termination in violation of public policy, (2) defamation, and (3) discrimination based on sex.

For termination in violation of public policy, McGinnis alleged that her termination was done for the purpose of interfering with the Department of Health's investigation into the patient's death in January 2022. For defamation, McGinnis alleged that Martin and Wandler defamed her by making false statements to her other employers regarding her job performance. And, finally, for sex discrimination, McGinnis alleged that she, as a female, was subject to disciplinary action related to a patient death, but male employees who had been involved in a prior, similar death were not.

The Defendants filed motions for summary judgment.[3] The Defendants argued that there was no violation of public policy because, in part, McGinnis had no evidence that her termination was intended to interfere with, or could interfere with, the Department of Health investigation. For defamation, the Defendants argued that McGinnis had no evidence that any false statements were made to her other outside employers. Finally, the Defendants argued that McGinnis could not make a prima facie case of sex discrimination because the male employees involved in the prior

---

[2] It appears that McGinnis filed an initial complaint in March 2023; however, that complaint is not in the record before this court.

[3] At the trial court, ARS, Pacific Northwest Recovery Center, Burstin, and Martin were collectively represented by one firm. Roa and Martin were both represented by a separate firm.

patient death did not engage in any improper conduct—specifically, they did not falsify patient records by claiming to see patients that they did not see.

McGinnis responded to the motions for summary judgment with a reframing of her initial allegations.[4] McGinnis claimed that her unlawful termination in violation of public policy claim should survive summary judgment because the evidence showed that she was terminated because the Defendants were orchestrating a cover-up regarding the patient death and that they did not want a "vocal" employee onsite during the investigation. CP at 439. McGinnis claimed her defamation claim should survive summary judgment because even if Roa's false statements were only communicated between Roa, Martin, Burstin, and Wandler, the statements were not privileged because they were not just false, they were based on a biased investigation. For sex discrimination, McGinnis argued that the evidence showed text messages and other comments that characterized her as passionate, rude, aggressive, and "spicy." CP 434. McGinnis argued this evidence showed discriminatory intent based on sex stereotypes related to aggressive woman and this discriminatory intent directly contributed to her termination.

III. EVIDENCE ON SUMMARY JUDGMENT

The parties submitted voluminous evidence on summary judgment including declarations, depositions, and exhibits. Two main categories of evidence are relevant for the issues on appeal: the evidence related to Roa's video investigation (the findings of which he relayed to Burstin and Wandler), and McGinnis' proffered evidence of discriminatory intent.

---

[4] McGinnis also moved, under CR 56(f), to continue summary judgment to provide additional time for discovery. She contended that she was still seeking discovery related to the actual video footage that had not been preserved by ARS. The trial court denied the motion. McGinnis does not appeal the superior court's ruling on her CR 56(f) motion.

A. EVIDENCE RELATED TO ROA'S VIDEO INVESTIGATION

In his deposition, Roa testified consistently with the above facts describing his investigation of the video footage. The written timeline he created while reviewing the video footage was included as an exhibit.

In response, McGinnis filed a declaration in which she factually disputed the findings of Roa's investigation. McGinnis explained that her "everyday habit" was to get up for work between 3:00 a.m. and 4:00 a.m., and she would either go to work at Recovery Village or her other employer, Rainer Springs, depending on her patient load. CP at 344. McGinnis stated that on January 2 (one of the days of the video footage reviewed by Roa), she had no patients at Rainier Springs, so she went directly to Recovery Village. She said she would have left home before 6:15 a.m. McGinnis stated that her patient notes on that day were all opened prior to 8:00 a.m. and that Roa's timeline "left out" video footage before 8:00 a.m. CP 347.

McGinnis' declaration suggests that she arrived at Recovery Village early in the morning the next day, January 3, because she stated that her records from her other employer, Rainer Springs, show that she arrived at *that* facility at approximately 10:00 a.m. McGinnis confirmed that she had seen the patient who would later pass away, conducted a comprehensive physical on the patient, and discussed lab results with him.

Further, McGinnis said that Roa's claims about the multiple complaints about her could not have been accurate. Instead, McGinnis claimed that Roa's investigation was prompted, not by genuine concern about whether she was seeing patients, but by her text messages to Roa on January 3, in which she told Roa that staff were looking for him and inquired when he would be returning to work:

| McGinnis | Are you in tomorrow? |
|---|---|
| Roa | Questionable 😶 |
| Roa | Ha. Yes I'll be in tomorrow. |
| McGinnis | Ok. Seems like everyone wants you |
| Roa | Patients or staff |
| Roa | People keep asking when they'll see you lol Staff |

CP at 351. Further, McGinnis identified additional text messages between Roa and Martin, the nursing director, which McGinnis characterized as "hardly the type of professional interaction one would expect when reviewing footage investigating license[-]ending falsification allegations of one [of] your alleged best friends":

| Roa | I'm trying to log into the camera |
|---|---|
| Roa | Any numbers come through |
| Martin | 834882 |
| Roa | Yay |
| Martin | :) |
| Martin | Find anything good on the cameras? |
| Roa | I feel like such a creeper |

CP at 351.

The full text message exchange between Roa and Martin that took place contemporaneously as Roa reviewed the video footage was also included in the record:

[Roa]: Still looking.
[Roa]: Slowly
[Martin]: Oh wow.
. . . .
[Roa]: [crying face emoji]
[Martin]: Uh oh! What's a crying face mean???
[Martin]: Comon—don't leave me wondering!!!
[Roa]: I'm looking all over the building
[Roa]: Bc I don't see that she seen anyone

> [Martin]: And. . . .
>
> [Martin]: Holy shit!!!
>
> [Roa]: Arrived at 8:30 and left by 10:15
>
> [Roa]: Talked to nurses
>
> [Martin]: So what your saying is our intuition and nurses we trust sharing their concern might just be correct??
>
> [Martin]: Ugh I kinda feel sick
>
> [Roa]: [crying face emoji]
>
> [Martin]: Imma cry with you!
>
> [Martin]: [crying face emoji]
>
> [Roa]: There might be hope.  I just spotted her
>
> [Martin]: Yay—come on Lindsay—you got this—see your patients girl!
>
> . . . .
>
> [Martin]: Killin me!
>
> [Roa]: I had to make sure.
>
> [Roa]: She didn't see anyone
>
> [Roa]: I have a play-by-play of her entire day.  She saw Edrick and she saw the detox nurse and then she left

CP at 1298-99.

In response to McGinnis' declaration and her text message exhibits, which challenged the motivations behind, and completeness of, Roa's investigation, Roa submitted a supplemental declaration in which he explained:

> [A]s set forth in my timeline and transmittal e-mail, I reviewed the surveillance footage for *all 24 hours* of January 2, 2022, and January 3, 2022, including the period from 4:00 a.m. to 8:00 a.m. on each day.  The timeline starts at 8:00 a.m. because Lindsay McGinnis first arrived at the facility at 8:02:09 a.m. on January 2, 2022, and at 8:30:28 a.m. on January 3, 2022.  Ms. McGinnis did not appear in any of the reviewed surveillance footage prior to 8:00 a.m. on January 2 or January 3, 2022.  The timeline comprises my accurate and contemporaneous account of the surveillance footage when I reviewed it.
>
> . . . .

Ms. McGinnis did not appear in any of the reviewed surveillance footage prior to 8:00 a.m. There is no evidence that Ms. McGinnis arrived at the facility prior to 8:00 a.m. other than: (i) her own handwritten notes, which I understand were "all from memory" and were written on January 14, 2022, over ten days later; and (ii) the "Start Time" and "End Time" that Ms. McGinnis entered into her patients' medical progress notes, all of which were dated and signed after 9:00 a.m. It is worth noting that Ms. McGinnis could have drafted and signed the medical progress notes at any time, as she was issued a company laptop for working on patient charts remotely outside the office.

CP at 1439-40.

During discovery, it was determined that the video footage that Roa had reviewed was no longer available despite attempts to retrieve it. Eventually, Roa located an old computer that contained some, but not all, of the video footage.

B. PURPORTED EVIDENCE OF DISCRIMINATORY INTENT

In her declaration, McGinnis characterized herself as "unashamedly a stark advocate of patient care" who "frequently challenged [her] peers and superiors to do better." CP at 342. She noted that she was "often a vocal and outspoken person at meetings" and that this made her "a target of derisive remarks" from Martin and Roa in their text exchanges. CP at 342. She noted that Roa and Martin had referred to her as "spicy," and Martin had characterized her behavior as "rude." CP at 343.

Deposition transcripts were also submitted as part of the summary judgment evidence. In Martin's deposition, she discussed what she had referred to as McGinnis' inappropriate behavior:

[Counsel]: And do you recall any complaints from Dr. Roa about [McGinnis]?

[Martin]: From Dr. Roa about [McGinnis], no, I don't recall any. I mean, there would be times that he and I would talk about things because she'd be really passionate on our flash calls[5] and—and those were like all of corporate and

---

[5] Flash calls or flash meetings were short daily meetings that took place with the Recovery Village staff and ARS leadership.

sometimes that passion seemed a bit too much. I remember Dr. Roa and I talking about that, but outside of that, no.

[Counsel]: Can you give me an example of what you mean by when you say she was passionate about, about whatever?

[Martin]: Just the way that she'd, if she felt like—and I—I can only take it of how I experienced it, but it seemed like if she felt passionate about something, she would—the way that she'd speak to our executive team on the calls on several occasions was—I'm trying to think of how to classify it, but it was in my opinion rude, you know.

It didn't seem appropriate to speak to the supervisors in a group setting like that, you know, because there would be at times 10, 15 of us on those calls and that happened a couple of different times.

And while I didn't agree with the, you know, how passionate she was, how she voiced that, I understood where—you know, it seemed like it was coming from a good place. It wasn't inappropriate to feel that way, it was just it was done on the group call.

CP at 688-89.

In Roa's deposition, he was asked about Martin's characterization of McGinnis during the

flash meetings:

[Counsel]: Ms. Martin had some comments about calls that occurred with leadership, executive leadership, and she said that there were some incidences, incidents where [McGinnis] was very passionate, does that ring a bell for you?

[Roa]: As [McGinnis] would put it, she refers to herself as spicy so and that's in our text conversation. So there were a number of times that she would reach out to me to help smooth things over with the staff or with situations that arise.

[Martin's] talking specifically about flash where our—Nanci, she is the VP of Clinical, I don't remember her title exactly, but this specific incident [McGinnis] was being very unprofessional is what I would call it to everyone on the phone and specifically to this VP who then reached out to me personally and [Martin] reached out to me as well.

. . . .

[Counsel]: And so you said [McGinnis] was spicy, was that a term that she came up with herself?

[Roa]: Yes, and you can see it on her text messages. She'll say I was spicy again today or something to that effect.

[Counsel]: Any other incidents that you recall?

[Roa]: Well, there were a couple of those instances again where [Martin] happened to talk to her, the VP asked me to talk to her, the new Executive Director after [Martin] asked me to talk to her, Dr. Richmond spoke to her briefly one time, I think those are it and those were more in the moment corrections.

[Counsel]: So the new Executive Director after [Martin] spoke to you about it?

[Roa]: Oh, sorry. No. No. No. I'm getting lost. The one before [Martin], David.

CP at 753-55.

An extensive amount of text messages were also included in the record for summary judgment, including the messages between Martin and Roa regarding the flash meetings:

[Martin (10/06/2021)]: Whew [McGinnis] is inappropriately hot this morning.

[Martin (10/06/2021)]: I was just surprised w how [McGinnis] spoke to Nancy.

. . . .

[Martin (11/10/2021)]: Also Lindsay did it again. Be prepared to hear from Nanci.

[Roa (11/10/2021)]: Loved "Also Lindsay did it again. Be prepared to hear from Nanci."

CP at 1297. There were also a few references Roa made directly to McGinnis about her being "spicy," which were unrelated to the flash meetings:

[Roa (11/18/2021)]: Release the spicy!!!

. . .

[Roa (11/16/2021)]: Your spicy works

. . . .

[Roa (07/23/21)]: Well that's exciting. I like mildly spicy

CP at 1338-39, 1373.

For her summary judgment response, McGinnis also engaged an expert to submit a report on stereotyping, bias, and discrimination. The report reviewed the extensive scientific research of sex stereotyping and how sex stereotypes result in discrimination. The report posited that women

face backlash when they violate sex stereotypes by being assertive. However, the report did not offer any opinion regarding the facts of McGinnis' case specifically, nor did it offer any conclusions on whether McGinnis was subject to discrimination or backlash based on gender stereotypes.

IV. Summary Judgment Ruling

After hearing arguments, the superior court granted defendants' motions for summary judgment and dismissed all of McGinnis' claims. The superior court ruled (1) that McGinnis had failed to establish a public policy that was violated by her termination, (2) that McGinnis' defamation claim failed because the Defendant's statements were privileged, and (3) that the few text messages that McGinnis identified were not sufficient to establish a prima facie case of sex discrimination.

ANALYSIS

McGinnis appeals, arguing that the superior court erred by granting the Defendants' motions for summary judgment on two of her claims—defamation and sex discrimination.[6] We affirm the superior court.

I. Summary Judgment

We review summary judgment orders de novo. *W.M. v. State*, 19 Wn. App. 2d 608, 621, 498 P.3d 48 (2021), *review denied*, 1 Wn.3d 1012 (2022). Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter

---

[6] McGinnis appeals only the superior court's order granting summary judgment on her defamation and sex discrimination claims against ARS, Pacific North Recovery Center, and Roa. She does not appeal the dismissal of her claim for termination in violation of a public policy, nor does she appeal the dismissal of her discrimination claims against Martin, Burstin, or Wandler.

of law. *Id.*; CR 56(c). A genuine issue of material fact exists if reasonable minds could disagree on the conclusion of a factual issue that controls the outcome of the litigation. *Sartin v. Estate of McPike*, 15 Wn. App. 2d 163, 172, 475 P.3d 522 (2020), *review denied*, 196 Wn.2d 1046 (2021). We review all facts and reasonable inferences drawn from those facts in the light most favorable to the nonmoving party. *Id.*

"The party moving for summary judgment bears the initial burden to show there is no genuine issue of material fact." *Id.* If a moving defendant shows there is an absence of evidence to support the plaintiff's case, then the burden shifts to the plaintiff to present specific facts that reveal a genuine issue of material fact. *Id.* "An issue of material fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). The plaintiff cannot rely on speculation or conclusory assertions that unresolved factual issues remain. *Seven Gables Corp., v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). "Summary judgment is appropriate if a plaintiff fails to show sufficient evidence that creates a question of fact about an essential element on which he or she will have the burden of proof at trial." *Sartin*, 15 Wn. App. 2d at 172.

II. DEFAMATION

McGinnis argues that the superior court erred when it dismissed her defamation claim on the basis of privilege. She acknowledges that the allegedly false conclusions from Roa's investigation were not shared with her other employers, but she argues that Roa's statements about the investigation to ARS leadership executives are actionable and not protected by privilege because Roa acted with malice and reckless disregard for the truth.

"To establish a prima facie defamation claim, the plaintiff must show (1) that the defendant's statement was false, (2) that the statement was unprivileged, (3) that the defendant was at fault, and (4) that the statement proximately caused damages." *Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*, 114 Wn. App. 371, 378, 57 P.3d 1178 (2002).

Washington recognizes a qualified privilege for the protection of common interests. *Momah v. Bharti*, 144 Wn. App. 731, 747, 182 P.3d 455 (2008), *review granted and case dismissed*, 165 Wn.2d 1027 (2009). " 'The common interest privilege applies when the declarant and the recipient have a common interest in the subject matter of the communication.' " *Id.* (quoting *Moe v. Wise*, 97 Wn. App. 950, 957-58, 989 P.2d 1148 (1999)). The common interest privilege generally applies to organizations, partnerships, and associations and " 'arises when parties need to speak freely and openly about subjects of common organizational or pecuniary interest.' " *Id.* at 747-48 (quoting *Moe*, 97 Wn. App. at 958-59).

However, even if a qualified privilege exists, a plaintiff can still prevail on their defamation claim if they can show *actual* malice. *Id.* at 742 (" '[A] showing of actual malice will defeat a conditional or qualified privilege.' " (alteration in original) (quoting *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 183, 736 P.2d 249 (1987))). Actual malice is shown by clear and convincing proof of knowledge or reckless disregard as to the falsity of a statement. *Id.*

Here, McGinnis' defamation claim is based on Roa communicating to ARS leadership, Burstin, and Wandler, his allegedly false findings from a substandard investigation of the video footage. She contends that Roa's review of the video failed to capture her time at the facility accurately because he limited his review to only when he assumed she was there, suggesting that Roa intended from the beginning to conduct a sham investigation. These failings in Roa's

investigation, according to McGinnis, led to his statements to Burstin and Wandler being defamatory and, ultimately, led to her termination.

The common interest privilege clearly applies to these communications. Roa, Burstin, and Wandler were all members of the same organization, and they had a common interest in addressing any employee performance or disciplinary issues. Thus, Roa's statements to Burstin and Wandler are privileged unless McGinnis can establish a genuine issue of material fact as to whether Roa acted with actual malice.

To show malice, McGinnis relies heavily on a text exchange between Roa and Martin which she claims demonstrates Roa was "giddy" about reviewing the video footage to see if McGinnis had done anything wrong:

> Roa: I'm trying to log into the camera
> Roa: Any numbers come through
> Martin: 834882
> Roa: Yay
> Martin: :)
> Martin: Find anything good on the cameras?
> Roa: I feel like such a creeper

Br. of Appellant at 54 (boldface omitted) (quoting CP at 2386, 1298).

Setting aside the absence of anything from Roa that reasonably supports McGinnis' speculative characterization of him being "giddy" about finding misconduct, McGinnis ignores the text messages immediately following this exchange during which Roa expresses surprise and concern based on what he is seeing in the video footage. In the following exchange, Roa appears to be providing a contemporaneous recitation of his reactions while reviewing the video footage:

> [Roa]: Still looking.

16

[Roa]: Slowly

[Martin]: Oh wow.

. . . .

[Roa]: [crying face emoji]

[Martin]: Uh oh! What's a crying face mean???

[Martin]: Comon—don't leave me wondering!!!

[Roa]: I'm looking all over the building

[Roa]: Bc I don't see that she seen anyone

[Martin]: And. . . .

[Martin]: Holy shit!!!

[Roa]: Arrived at 8:30 and left by 10:15

[Roa]: Talked to nurses

[Martin]: So what your saying is our intuition and nurses we trust sharing their concern might just be correct??

[Martin]: Ugh I kinda feel sick

[Roa]: [crying face emoji]

[Martin]: Imma cry with you!

[Martin]: [crying face emoji]

[Roa]: There might be hope.  I just spotted her

[Martin]: Yay—come on Lindsay—you got this—see your patients girl!

. . . .

[Martin]: Killin me!

[Roa]: I had to make sure.

[Roa]: She didn't see anyone

[Roa]: I have a play-by-play of her entire day.  She saw Edrick and she saw the detox nurse and then she left

CP at 1298-99.

Even taking the evidence in the light most favorable to McGinnis (by assuming that Roa

conducted a substandard review of the video by reviewing only the time he believed she was in

the building), the text messages do not demonstrate that Roa acted with actual malice. The evidence actually shows that Roa was genuinely attempting to determine whether McGinnis saw her patients on January 3. In the text messages, Roa expresses surprise that McGinnis appears to have been on the property for only about two hours and did not see any patients. Simply put, the text messages as a whole do not support McGinnis' position that Roa approached the video review intending in advance to reach, and subsequently report, false conclusions.

McGinnis challenges this conclusion by citing *Wood v. Battle Ground School District*, 107 Wn. App. 550, 27 P.3d 1208 (2001). In *Wood*, the plaintiff, a school district communications coordinator, sued the school board president for making a statement to a newspaper claiming that the plaintiff's performance was "lacking." *Id.* at 556-57. The school board president claimed, in part, a qualified privilege based on his position as school board president. *Id.* at 568. But the court found sufficient evidence of actual malice[7] to overcome the protection of a qualified privilege; specifically, the court found,

> (1) that [the school board president] knew of [the communication coordinator's] good to excellent performance evaluations a month before he made the statement, (2) that he had little direct contact with her on which to base his statement, (3) that he based his statement on an incident that two district patrons reported to him, on information from a district employee who left her job at the end of her 90-day probationary period, and on mistakes in District publications, and (4) that [the school board president] had made it known for some time that he wanted to remove [the communication coordinator's] from the District."

*Id.* at 570. McGinnis argues that she has presented facts that are similar, if not more egregious than those presented in *Wood*, and therefore, there is a genuine issue of material fact as to whether

---

[7] Although the school board president claimed a different privilege, the court applied the same standard for actual malice that applies to the common interest privilege.

she has overcome the common interest privilege by showing Roa's statements were made with actual malice.

*Wood* is distinguishable. Although McGinnis claims that, like in *Wood*, Roa had prior knowledge of McGinnis' good performance reviews, these performance reviews, while generally positive, had also recently documented concerns regarding McGinnis' dependability. McGinnis also seems to compare the unreliable information on which the school board president based his statement in *Wood* to the alleged unreliability of the information from staff and patients that Roa used to initiate his investigation. But here, Roa based his eventual statements on his own personal investigation, not merely the information gathered from others. Finally, whereas in *Wood*, there was direct evidence that the school board president had wanted to remove the communications coordinator, here, there is no direct evidence Roa had developed any intention to get McGinnis terminated, notwithstanding McGinnis' list of speculative facts that she contends suggest otherwise.

In the end, regardless of the thoroughness of Roa's investigation, there is no evidence, beyond McGinnis' speculation, that Roa acted with actual malice by knowingly falsifying his investigation or communicated the results of the investigation with reckless disregard for the truth. Because McGinnis has failed to establish a genuine issue of material fact that Roa made the statements with actual malice, the Defendants are entitled to the protections of the qualified common interest privilege. This privilege defeats McGinnis' claim, regardless of whether Roa's statements to Burstin and Wandler were ultimately false. Thus, the superior court did not err by granting the Defendants' motions for summary judgment on defamation.

III. DISPARATE TREATMENT

McGinnis claims that the superior court erred when it dismissed her claim for discrimination based on sex because there were genuine issues of material fact as to discriminatory intent and whether that intent was a substantial factor in her termination.

Claims for disparate treatment may be brought under the WLAD. *See*, *e.g.*, *Johnson v. Chevron U.S.A., Inc.*, 159 Wn. App. 18, 27, 244 P.3d 438 (2010) (stating the WLAD "gives rise to a cause of action for . . . disparate treatment"), *review denied*, 171 Wn.2d 1020 (2011). Discrimination based on sex or gender is prohibited by the WLAD. RCW 49.60.180(2), (3). To establish a prima facie case of disparate treatment, the plaintiff must show that (1) she was a member of a protected class, (2) that she was qualified or doing satisfactory work, (3) she suffered an adverse employment action, and (4) the adverse employment action occurred under circumstances that support a reasonable inference of unlawful discrimination. *Marin v. King County*, 194 Wn. App. 795, 808-09, 378 P.3d 203, *review denied*, 186 Wn.2d 1028 (2016).

Generally, courts have recognized two methods of proving discrimination cases. *Bittner v. Symetra Nat'l Life Ins. Co.*, 32 Wn. App. 2d 647, 658, 558 P.3d 177 (2024). Under the *McDonnell Douglas*[8] burden-shifting framework, the employee must first produce circumstantial evidence to establish a prima facie case of discrimination. *Id.* If the employee makes this showing, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* If the employer meets this burden, the employee must produce

---

[8] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

circumstantial evidence showing that the employer's stated reason for the employment action was pretextual. *Id.* at 658-59.

"Under the direct evidence test, a plaintiff can establish a prima facie case by providing direct evidence that (1) the defendant employer acted with a discriminatory motive and (2) the discriminatory motivation was a significant or substantial factor in an employment decision." *Alonso v. Qwest Commc'ns Co., LLC*, 178 Wn. App. 734, 744, 315 P.3d 610 (2013). "We generally consider an employer's discriminatory remarks to be direct evidence of discrimination." *Id.*

Here, McGinnis argues that she has met her burden to make a prima facie case by demonstrating discriminatory intent or showing that her sex was a substantial factor in the decision to terminate her. McGinnis' contention that she has created a genuine issue of material fact of discriminatory intent is largely based on evidence that Roa considered her "spicy."[9] McGinnis argues that the term is often related to people expressing negative opinions of women who fail to conform to socially accepted gender stereotypes.

Without speculating about the use of term "spicy" in other contexts, we are not persuaded that, in this case, McGinnis has shown it represents prima facia evidence of discriminatory intent or motive, which is necessary for either the *McDonnell Douglas* test or the direct evidence test. The primary evidence of alleged discriminatory intent comes from Roa's deposition where he is

---

[9] McGinnis also relies on text messages and characterizations made by Martin in her deposition. *See* Br. of Appellant at 40 (relying on characterizations of "rude" and "passionate," which were only comments made by Martin). However, McGinnis does not appeal the order of summary judgment granted for Martin, and she makes no additional argument that Martin had a role in her termination, therefore, we do not address the evidence of Martin's alleged discriminatory intent.

asked about McGinnis being "spicy," but, as shown in the deposition, this was primarily a term

McGinnis applied to herself:

> [Roa]: As [McGinnis] would put it, she refers to herself as spicy so and that's in our text conversation. So there were a number of times that she would reach out to me to help smooth things over with the staff or with situations that arise.
>
> . . . .
>
> [Counsel]: And so you said [McGinnis] was spicy, was that a term that she came up with herself?
>
> [Roa]: Yes, and you can see it on her text messages. She'll say I was spicy again today or something to that effect.
>
> [Counsel]: Any other incidents that you recall?
>
> [Roa]: Well, there were a couple of those instances again where [Martin] happened to talk to her, the VP asked me to talk to her, the new Executive Director after Amber asked me to talk to her, Dr. Richmond spoke to her briefly one time, I think those are it and those were more in the moment corrections.

CP at 754-55. In the few instances where Roa referred to McGinnis as spicy, the references

reasonably appear from their context to be used as a primarily positive term rather than a negative

one:

> [Roa (11/18/2021)]: Release the spicy!!!
>
> . . . .
>
> [Roa (11/16/2021)]: Your spicy works
>
> . . . .
>
> [Roa (07/23/2021)]: Well that's exciting. I like mildly spicy

CP at 1338-39, 1373.

Viewing the entire record, including the way the term was used both by McGinnis herself

and in an apparently positive manner by Roa, McGinnis has failed to show that the term, *in this

case*, is indicative of discriminatory intent.

Moreover, even if we considered the use of the term "spicy" to be evidence of discriminatory intent, McGinnis fails to present evidence establishing any relationship between the use of the term and her termination. There was no temporal connection between any of McGinnis' behavior that was characterized as "spicy" and any adverse employment action. The reference Roa made to McGinnis being "spicy" that was closest to McGinnis' termination occurred on November 18, when Roa texted "Release the spicy!!!" in response to McGinnis' texts about a situation unrelated to Recovery Village. CP at 1338.

McGinnis contends there is a connection, however, between the use of the term and her termination. McGinnis claims that she had expressed concern directly to Roa about staff wanting to see him and his attendance at work in their brief text message exchange on January 3—a message she sent immediately before Roa began his investigation into her seeing patients and falsifying patient records. McGinnis speculates that the perception of her being "spicy" coupled with her January 3 text to Roa caused him to be aggrieved enough to concoct a scheme to fabricate allegations to get her terminated.

But there is simply nothing to support this speculation. In his deposition, Roa explained that he had been on paid time off for a long weekend around the New Year's holiday and McGinnis did not know whether he was going to be back on Monday the 3rd or Tuesday the 4th. From Roa's perspective, this is why McGinnis was reasonably inquiring about when he was going to be at work. It is true that McGinnis texted Roa that patients and staff were looking for him on Monday morning on January 3, but Roa was at the facility later that same day, so there is no reasonable

basis to infer that Roa would have been angered by her text message such that he would have initiated his investigation into McGinnis.[10]

Because McGinnis has failed to show discriminatory intent or that any discriminatory intent was a substantial factor in her termination (or otherwise show circumstantial evidence to establish a prima facie case of discrimination), there is no genuine issue of material fact as to her discrimination claim. Accordingly, the superior court did not err by granting the Defendants' motion for summary judgment of McGinnis' discrimination claim.

## CONCLUSION

McGinnis has failed to establish a genuine issue of material fact as to her discrimination and defamation claims. Accordingly, we affirm the superior court's orders granting summary judgment to ARS, Pacific North Recovery Center, and Roa.[11]

---

[10] McGinnis also contends that there is a genuine issue of material fact as to whether similarly situated persons were treated differently. But she does not identify any similarly situated employee or explain how such a similarly situated employee was treated differently besides alleging that she was investigated while her male co-workers were not. For example, while perhaps not required, McGinnis failed to provide any "comparator" evidence; she failed to identify any male employee (or even a female employee who was not identified as "spicy") who was accused of or determined to have falsified records of patient visits and was not terminated. Therefore, McGinnis has provided no additional evidence, circumstantial or otherwise, that would support an inference of discrimination.

[11] McGinnis appears to include a request for attorney fees under RAP 18.1 and RCW 49.60.030 "in the event Petitioner must include a fee request to preserve the fees on appeal to later be awarded by the trial court." Br. of Appellant at 57. Because we affirm the superior court's orders on summary judgment, there is no need to preserve a claim for attorney fees. We do not address McGinnis' apparent request for attorney fees further.

No. 59931-7-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

PRICE, J.

We concur:

MAXA, P.J.

CHE, J.